**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DARRELL PRIDY *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:19-cv-00468** |
| **DUKE ENERGY CORPORATION,** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

Plaintiffs Local Union 702 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industries (the "Union") and Union members Darrell Pridy, Gregory Nabors, Michael Sanders, and Randall Abston (the "individual plaintiffs"), on behalf of themselves and other similarly situated, bring suit against Duke Energy Corporation for alleged violations of Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-12-401, and Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Now before the court is Duke Energy's Motion to Dismiss the plaintiffs' First Amended Complaint. (Doc. No. 10.)

For the reasons set forth herein, the motion will be granted, but without prejudice to the plaintiffs' ability to seek leave to amend.

## I. FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

The plaintiffs filed suit on May 31, 2019 and filed their First Amended Complaint (Doc. No. 7) (hereafter, "Complaint") on June 20, 2019, within twenty-one days of service. The

plaintiffs allege that the individual plaintiffs are all over the age of forty; have been "employed by Duke Energy and/or its predecessors" for decades; and have "participated in various employee benefit plans, including a welfare benefit plan for Duke Energy employees providing sick leave and short-term disability benefits." (Doc. No. 7 ¶¶ 1–4.)

They allege that the individual plaintiffs began their employment with "the Company"[1] when it was Nashville Gas Company, which was later acquired by and became a division of Piedmont Natural Gas Company ("Piedmont Gas"). (*Id.* ¶ 10.) The plaintiffs allege that, in October 2016, "Duke Energy acquired and became successor to Piedmont Gas, which is now a subsidiary of Duke Energy." (*Id.*; *see also id.* ¶ 6 ("Duke Energy . . . operates a subsidiary Company called Piedmont Natural Gas, which is registered to do business in the state of Tennessee.").) Although they allege that Piedmont Gas is registered to do business in the state of Tennessee, they do not allege that Duke Energy is. Despite acknowledging Piedmont's continued corporate existence and status as a subsidiary, the plaintiffs assert that Duke Energy "became successor to Piedmont Gas" and that, as successor, "it is obligated and bound by the applicable collective bargaining agreements" discussed in the Complaint. (*Id.* ¶ 10.)

During their employment, the individual plaintiffs have continuously been members of the Union and represented by it in collective bargaining. (*Id.* ¶ 15.) The plaintiffs claim that, "[a]t all times during [the individual plaintiffs'] employment, [the Company] was and continues to be a party to the collective bargaining agreement with [the Union]." (*Id.* ¶ 16.)

The plaintiffs allege that the collective bargaining agreement in effect from 1989 to 1992 ("1989 CBA") between the Company and the Union "established a sick leave and short-term

[1] The plaintiffs use the terms Duke Energy, "the Company," and "Defendant" interchangeably throughout the Complaint, when it is apparent from context they really mean Duke Energy *or its predecessor*. To be consistent with the plaintiffs' usage and to attempt to minimize confusion, the court will use the term "the Company."

disability benefit plan ('Plan')"governed by Section X of that document. The plaintiffs assert that Section X of the 1989 CBA "and successive collective bargaining agreements are the governing Plan documents." (*Id.* ¶ 18.)

The 1989 CBA's Plan allowed participants to accrue sick leave days as they worked for "the Company" and to "bank" the accumulated days. The 1989 CBA refers to the accrued sick leave account as a "sickness allowance." (*Id.* ¶ 19.) The benefit Plans described in subsequent collective bargaining agreements in effect over the ensuing decade continued to adopt a similar sickness allowance policy, permitting the accrual of hours of unused sick leave and the banking of such time. The collective bargaining agreement adopted in 1999 and in effect until 2004 (the "1999 CBA") was the last collective bargaining agreement to allow the unlimited accrual of sick leave hours. (*Id.* ¶¶ 18–20.) The sickness allowance effectively rewarded individuals who did not take frequent sick leave by allowing them to continue to accrue an unused allotment by carrying over those hours from year to year. (*Id.* ¶ 24.)

The collective bargaining agreement that went into effect on December 31, 2004 ("2004 CBA"), eliminated the accumulation of hours in "Leave Banks" going forward, but it allowed participants with hours already accrued in their Leave Banks to carry over and use that time as described in the 2004 CBA. (*Id.* ¶ 25.) The relevant provision in the 2004 CBA provided, in relevant part:

> Employees are credited with 12 days of sick leave each January 1 to be taken as needed for any period of illness during the calendar year. They may also use any accrued sick days in their Leave Bank (sick leave earned before January 1, 2005) when all of their annual sick days have been used or for a certified FMLA Leave to care for an immediate family member. Banked days may also be used to cover the waiting period before short-term disability benefits begin.

(*Id.* ¶ 26.)

According to the plaintiffs, the collective bargaining agreements in effect from August

2008 through August 2012 ("2008 CBA") and from August 2012 through August 2018 ("2012 CBA") similarly recognized employees' ability to use Leave Bank time accrued prior to January 2005. (*Id.* ¶ 27.) The current collective bargaining agreement ("2018 CBA") went into effect on April 14, 2018. (Doc. No. 11-4.) The 2018 CBA is silent regarding Leave Banks and leave hours accrued prior to 2015. (*See generally id.*) However, in April 2018, the Company eliminated employees' access to an online portal for accessing their Leave Banks and began refusing to honor the accrued time in employees' Leave Banks. The Company allegedly provided no prior notice of this action. All of the individual plaintiffs and putative class members had accrued sick leave hours in their Leave Banks. At least one of the individual plaintiffs requested to use accrued leave time in late April 2018 but was informed by his supervisor that "the Company no longer allowed employees to use those benefits." (*Id.* ¶ 30.)

The plaintiffs allege that, during negotiations leading up to execution of the 2018 CBA, the Company and the Union did not bargain over sick leave and short-term disability benefits that were owed under prior collective bargaining agreements. (*Id.* ¶ 32.) "[I]nstead, the Company unilaterally informed [the Union] that it would no longer honor accrued Leave Bank benefits in the new collective bargaining agreement, and unilaterally chose to deny accrued Leave Bank benefits" to the individual plaintiffs and the other 60 class members. (*Id.*; *see also* ¶ 34.)

Based on these allegations, the plaintiffs allege that Duke Energy violated ERISA by wrongfully denying accrued and nonforfeitable rights to banked sick and disability leave benefits; discriminated against them on the basis of age, in violation of the THRA; and violated the LMRA by breaching binding collective bargaining agreements.

In lieu of answering, Duke Energy filed its Motion to Dismiss, arguing that dismissal is required because, first, the plaintiffs have not brought suit against the proper party. In support of

this assertion, Duke provided as exhibits complete copies of the 2004, 2008, 2012, and 2018 CBAs. The 2004 CBA, like the 1999 CBA submitted by the plaintiffs, was entered into by and between the Union and "Nashville Gas Company, a division of Piedmont Natural Gas Company, Inc." (Doc. Nos. 7-3, 11-1.) The three more recent collective bargaining agreements, including the one that went into effect on April 14, 2018, are between the Union and Piedmont Gas. (Doc. Nos. 11-2, 11-3, 11-4.) Duke Energy also argues that the plaintiffs failed to raise their claims through the proper grievance and arbitration procedure set forth in the operative collective bargaining agreement; that the individual plaintiffs fail to state a claim for which relief may be granted under ERISA; and that the individual plaintiffs' claim under the THRA is completely preempted by the LMRA.

The plaintiffs have filed a Response (Doc. No. 15), arguing that the factual allegations in the Complaint, construed as true, show that Duke Energy is a proper party to this lawsuit and generally refuting the defendant's other arguments. With the court's permission, Duke Energy filed a Reply (Doc. No. 18.)

## II. STANDARD OF REVIEW

For purposes of a motion to dismiss under Rule 12(b)(6), the court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a

court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.* at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010).

The *Iqbal* Court suggested that a district court considering a motion to dismiss "can choose to begin" its analysis "by identifying pleadings that . . . are not entitled to the assumption of truth." *Id.* at 679. As indicated above, pleadings that do not constitute factual allegations, including "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations, need not be accepted as true. *Id.* at 681. The question is whether the remaining *factual* allegations plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). However, documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss. Fed. R. Civ. P. 10(c). In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007); *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999).

## III. DISCUSSION

Duke Energy asserts, as a threshold matter, that the plaintiffs' dispute arises out of contracts between the Union and the individual plaintiffs' employer, Piedmont Gas. It asserts

that, "[w]hile it is true that Duke Energy acquired Piedmont Gas in 2016, it is not true that Duke Energy thereby 'became the successor to Piedmont Gas' [or that it is] 'obligated and bound by the applicable collective bargaining agreements'" described in the Complaint. (Doc. No. 11, at 6–7 (quoting Doc. No. 7 ¶ 10).) It argues that, under Tennessee law, a parent corporation and subsidiary corporation are "presumed to be separate and distinct legal entities" and that the plaintiffs have not alleged facts that would permit them to "pierce the corporate veil" and make Duke Energy liable for its subsidiary's actions. (*Id.* at 7 (quoting *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 651 (Tenn. 2009); citing *Cambio Health Solutions, LLC v. Reardon*, 213 S.W.3d 785, 790–91 (Tenn. 2006)).) It also asserts that the plaintiffs' claim that Duke Energy is Piedmont Gas's legal successor is a legal conclusion—rather than a statement of fact that the court must accept as true for purposes of the Motion to Dismiss—and that successor liability and corporate veil piercing are "separate legal doctrines." (Reply, Doc. No. 18, at 1 (quoting *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 2403355, *8 (N.D. Ohio June 11, 2010)).)

For their part, the plaintiffs contend that the factual allegations in the Complaint must be accepted as true for purposes of ruling on the Motion to Dismiss. They point out that the Complaint alleges that "Duke Energy acquired and became successor to Piedmont Gas, which is now a subsidiary of Duke Energy," and that, as successor, Duke Energy is "obligated and bound by the applicable collective bargaining agreements described below." (Doc. No. 7 ¶ 10.) They argue that these allegations, assuming that the court draws all reasonable inferences in the plaintiffs' favor, as it must at this juncture, are sufficient to establish that Duke Energy, upon acquiring Piedmont Gas in October 2016, became the successor employer of the individual plaintiffs and assumed all of Piedmont Gas's obligations under the collective bargaining

agreements. (Doc. No. 15, at 6.) The plaintiffs also argue that, in labor and employment cases, federal common law, rather than Tennessee law, applies and that the federal courts have "applied an equitable, policy driven approach to successor liability 'that has very little connection to the concept of successor liability in corporate law.'" (Doc. No. 15, at 6–7 (quoting *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 551 (6th Cir. 2006)).)

Although the plaintiffs reference numerous collective bargaining agreements in the Complaint, they did not file any of them as exhibits to their pleading. Duke Energy attached to its Motion to Dismiss a copy of 2004 CBA, 2008 CBA, 2012 CBA, and 2018 CBA. (Doc. Nos. 11-1, 11-2, 11-3, 11-4.) Because these collective bargaining agreements are referred to in the pleadings and are integral to the plaintiffs' claims, the court may consider them without converting the motion to dismiss into one for summary judgment. *Commercial Money Ctr.*., 508 F.3d at 335–36.

Notably, all of the plaintiffs' claims hinge upon Duke Energy's purported repudiation of its alleged obligations under the collective bargaining agreements. In support of their claims, the plaintiffs assert that they became employed by the "Company," defined to include Duke Energy, at various times between 1979 and 1987 (Doc. No. 7 ¶¶ 11–14) and that, "[a]t all times during their employment, Defendant was and continues to be a party to a collective bargaining agreement" with the Union. (*Id.* ¶ 16.) However, the plaintiffs' allegation that Duke Energy is a party to the collective bargaining agreements is refuted by the collective bargaining agreements themselves. It is well settled that, when a document attached to the Complaint contradicts allegations in the Complaint, "the exhibit trumps the allegations." *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 536 (6th Cir. 2017) (citations omitted). This rule encompasses exhibits referred to in the pleadings and integral to the claims but actually supplied by the defendant.

The collective bargaining agreements themselves show that Duke Energy is not a party to them. Instead, the collective bargaining agreements are all between Piedmont Gas and the Union—including the 2018 CBA, which was executed and went into effect after Duke Energy acquired Piedmont Gas in 2016. Moreover, the plaintiffs do not allege that Duke Energy's acquisition of Piedmont Gas was in the form of a merger or that Piedmont Gas ceased to exist as a corporate entity. Instead, the Complaint acknowledges Piedmont Gas's continued independent existence, alleging that Piedmont Gas remains a subsidiary of Duke Energy and that Piedmont Gas (but apparently not Duke Energy) is registered to do business in Tennessee. (Doc. No. 7 ¶ 6.)

The plaintiffs maintain that their assertion that Duke Energy is Piedmont Gas's successor is a factual allegation that the court must accept as true at this juncture. The court is not persuaded. The question of successorship is a legal inquiry that is dependent upon many facts. *See Cobb*, 452 F.3d at 552 ("[T]he labor law concept of successor liability requires courts to balance the equities of imposing a particular legal obligation in a particular situation."). But the facts here, even liberally construed in the plaintiffs' favor, do not support the legal conclusion that Duke Energy is actually Piedmont's successor. The plaintiffs simply cannot escape the facts that Piedmont remains in existence and is the entity that entered into and is bound by the 2004, 2008, 2012, and 2018 CBAs.

The caselaw to which the plaintiffs refer in their Response to the Motion to Dismiss, indeed, establishes that the definition of a corporate successor is expanded in the context of cases involving labor relations and employment disputes, but theses cases do not support the extension of the concept as far as the plaintiffs would like. The primary case from the Sixth Circuit discussing the concept of successor liability in the labor law context is *Cobb v. Contract*

*Transportation, Inc.* There, the Sixth Circuit held that a company could be a "successor" company for purposes of liability on an FMLA claim, even where there was no continuity of ownership or control and no merger or transfer of assets between the predecessor and successor companies. 452 F.3d at 550. In *Cobb*, in fact, there was no relationship between the companies at all, except that both the predecessor and successor companies had contracted with the United States Postal Service to deliver mail between Philadelphia and Denver. When the successor company was awarded the contract with the Postal Service, it kept a majority of the predecessor company's employees, including the plaintiff. The Sixth Circuit concluded that the defendant was a "successor" employer under the FMLA, 29 U.S.C. § 2611(4)(A)(ii)(II). As a result, the employee was an "eligible employee" under 29 U.S.C. § 2611(2)(A)(i),[2] even though he had technically been employed by the defendant company for less than twelve months, because he had been employed by the predecessor for more than two years.

In reaching that decision, the court conducted a survey of the Supreme Court cases that have developed the concept of successor liability in the labor relations context. First, in *John Wiley & Sons v. Livingston*, 376 U.S. 543, 549 (1964), the Supreme Court had held that a defendant corporation formed as the result of a corporate merger was bound by the arbitration provision in the pre-merger corporation's collective bargaining agreement. Although the Court concluded that "the duty to arbitrate does not survive every corporate change, a 'successor' corporation will be bound by its predecessor's duty to arbitrate where 'there is a substantial continuity in the identity of the business enterprise.'" *Cobb*, 452 F.3d at 552 (quoting *John*

[2] An employee is "eligible" under the FMLA if he or she has been employed by the "employer with respect to whom leave is requested" for a minimum of twelve months and at least 1,250 hours of service. 29 U.S.C. § 2611(2)(A).

*Wiley*, 376 U.S. at 551). Notably, in that case, the predecessor corporation was no longer in existence, having been dissolved through the merger.

Next, in *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972), the Court clarified that a corporate defendant can be a successor for one purpose and not for another. In that case, as in *Cobb*, there was no relationship between the predecessor and successor companies, but the plaintiff union argued that the defendant, a security company for a third-party manufacturing facility, was bound by the collective bargaining agreement executed by the security company that had previously provided services for the same manufacturing facility. The Court held that the new security company, which had hired all of the old company's employees, was not bound by the collective bargaining agreement but that it did have an obligation to recognize the union's authority and to negotiate with it. *Id.* at 279–87.

In *Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973), the Supreme Court "extended successor liability from negotiations and the imposition of collective bargaining agreements to liability for unfair labor practices." *Cobb*, 452 F.3d at 553 (citing *Golden State*, 414 U.S. at 172). There, the defendant was a bona fide purchaser of a business that, prior to the acquisition, had committed an unfair labor practice by terminating an employee. Balancing all of the equities, the Court found that the defendant was liable for reinstating the discharged employee with back pay.

Finally, the Sixth Circuit noted in *Cobb* that it had extended successor liability from the labor context to Title VII in *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974). In that case, the court "emphasized that 'there is, and can be, no single definition of "successor" which is applicable in every legal context.' Successor liability questions must be answered on a case by case basis, and 'a new employer . . . may be a successor for some

purposes and not for others.'" *Cobb*, 452 F.3d at 554 (quoting *MacMillian*, 503 F.2d at 1089–91).[3]

None of these cases has any application to the plaintiffs' situation, for a simple reason. Regardless of the extent to which they stretched the concept of a "successor," they all involved a change in the identity of the employer and some reason for imposing successor liability on the new employer. As courts within this circuit and elsewhere have recognized, "[s]uccessor liability enables claimants to seek recourse from the successor that has replaced or entirely taken over the original entity." *In re Welding Fume Products Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 2403355. at *7 (N.D. Ohio June 11, 2010). On the other hand, if the original entity has not gone anywhere, "there is no successor—and no successor liability." *Id.* (collecting cases).

*Welding Fume* is instructive here. In that case, a products liability action, the court granted summary judgment to a parent corporation defendant, holding that it had no successor liability where the subsidiary corporations "still exist[ed] and continue[d] to operate separately as subsidiaries of the [parent]." *Id.* In their response in opposition to summary judgment, the

---

[3] In addition to those cited above, the plaintiffs reference two additional cases that, they claim, establish the breadth of the doctrine of successor liability when applied in the labor context. (*See* Doc. No. 15, at 7 (citing *Pension Benefit Guar. Corp. v. Findlay Indus., Inc.*, 902 F.3d 597 (6th Cir. 2018), *cert. dismissed sub nom. Sept. Ends Co. v. Pension Ben. Guar. Corp.*, No. 18-1265, 2019 WL 1455808 (U.S. Aug. 2, 2019); *Dupont Dow Elastomers, L.LC. v. N.L.R.B.*, 296 F.3d 495 (6th Cir. 2002). In *Findlay*, the Sixth Circuit applied successor liability in determining liability for unfunded pension liabilities under ERISA. *Pension Benefit Guar. Corp. v. Findlay Indus., Inc.*, 902 F.3d 597 (6th Cir. 2018), *cert. dismissed sub nom. Sept. Ends Co. v. Pension Ben. Guar. Corp.*, No. 18-1265, 2019 WL 1455808 (U.S. Aug. 2, 2019). The court held that, "when there is a sale that is not conducted at arm's length, successor liability can apply. And although we are reluctant to impose successor liability to reorganizations of failing businesses, that principle cannot be stretched so far as to demand judicial approval of deals that are not above board." 902 F.3d at 612. In *Dupont Dow*, the court applied *Burns*, holding only that the employer in that case was a "perfectly clear successor" in an arms-length transaction and, as such, was obligated to bargain with a union prior to fixing the terms and conditions of employment but, as in *Burns*, had no obligations under the pre-existing collective bargaining agreement. *Dupont Dow*, 296 F.3d at 506.

plaintiffs had also sought, in the alternative to successor liability, to hold the parent corporation vicariously liable for the actions of the subsidiaries under a veil-piercing theory. They claimed that, although the subsidiaries were still in existence, the parent corporation "largely ignored" their corporate structures, such that the plaintiffs should be entitled to pierce the corporate veil and reach the parent's assets for compensation. *Id.* at *8. The court recognized this as a new theory of liability: "Successor liability . . . and corporate veil-piercing, while based on many overlapping factors, are separate legal doctrines with distinct legal consequences." *Id.* (citation omitted). In particular, veil-piercing speaks to "an existing relationship between the corporation and its current owner," while successor liability concerns "the relationship between the corporation and its predecessor." *Id.* (citation omitted). The court rejected the plaintiff's veil-piercing argument on the basis that the complaint did not allege facts to support a veil-piercing theory of recovery. The plaintiffs did not, for example, allege any facts showing that the corporations operated as a "single business enterprise" or that the parent was simply the "alter ego" of the corporations. *Id.* (citations omitted). As a result, the complaint failed to state a claim against the parent under a veil-piercing theory. *Id.* (citations omitted).

Construed together, these cases mean that successor liability does not provide an avenue for relief here, because, although the plaintiffs use the word "successor" repeatedly in the Complaint and also claim that, in its capacity as successor, Duke Energy is the individual plaintiffs' employer and is bound by the various collective bargaining agreements, the plaintiffs do not allege facts showing that there was actually a change in the identity of their employer. They have not alleged that Piedmont Gas has ceased to exist or that it was completely subsumed by Duke Energy as a result of the acquisition. To the contrary, the plaintiffs affirmatively allege that Piedmont Gas still exists, and the fact that Piedmont Gas is the entity that negotiated with

the Union and executed the 2018 CBA serves as confirmation of its continued separate existence. In other words, what is at issue here is an existing relationship between a corporation—Piedmont Gas—and its current owner—Duke Energy. As *Welding Fume* makes clear, this type of relationship may give rise to a veil-piercing claim, but it does not accommodate a successor theory of liability. However, the Complaint does not actually articulate a veil-piercing theory either, nor have the plaintiffs alleged facts that, if true, would permit veil piercing—for example, that Duke Energy is the alter ego of Piedmont Gas or disregards its corporate form.

Because the allegations in the Complaint fail to establish a basis for successor liability (or veil-piercing), it fails to state a claim against Duke Energy for which relief may be granted. On this basis alone, dismissal of the Complaint is warranted, though such dismissal will be without prejudice to the plaintiffs' ability to file a properly supported motion to amend their complaint to name the appropriate defendant and/or allege facts that support claims against Duke Energy on the basis of successor liability or veil piercing.[4] Having reached this conclusion, the court will not address Duke Energy's other arguments.

## IV. CONCLUSION

For the reasons forth herein, the court will grant the Motion to Dismiss. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

[4] In their Response to the Motion to Dismiss, the plaintiffs request that, in the alternative to dismissal, they be granted "leave to amend the complaint to add Piedmont Natural Gas as a named defendant" and to "plead additional facts to assert joint employer and/or alter ego liability." (Doc. No. 15, at 8.) The court does not construe this informal request as an actual motion to amend, but the plaintiffs will have the ability to file such a motion.