# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **DARRELL PRIDY, GREGORY NABORS, MICHAEL SANDERS, and RANDALL ABSTON,** on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| And | ) ) | |
| **LOCAL UNION 702 OF THE UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRIES,** | ) ) ) ) ) ) ) | **No. 3:19-cv-00468** **District Judge Aleta A. Trauger** **CLASS ACTION** **JURY DEMAND** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **PIEDMONT NATURAL GAS COMPANY, INC.** | ) ) ) | |
| And | ) ) | |
| **DUKE ENERGY CORPORATION,** as the alter ego or successor in liability to **PIEDMONT NATURAL GAS COMPANY, INC.** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) AND THE TENNESSEE HUMAN RIGHTS ACT (THRA), AND THE LABOR MANAGEMENT RELATIONS ACT (LMRA)

Plaintiffs Darrell Pridy, Gregory Nabors, Michael Sanders, and Randall Abston ("Named Participants"), and Plaintiff Local Union 702 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industries ("Local 702" or the "Union") (collectively,

1

"Plaintiffs") hereby bring this First Amended Complaint against Piedmont Natural Gas Company ("Piedmont Gas" or "the Company"), and Duke Energy Corporation, as the alter ego or successor in liability to Piedmont Gas ("Duke Energy") (collectively, "Defendants"). Named Participants bring their cause of action as a putative class action on behalf of themselves and all others similarly situated under Section 502(a), of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for wrongfully denying them accrued sick leave and short-term disability benefits, as well as under the Tennessee Human Rights Act ("THRA") for discrimination on the basis of age. Local 702 brings its separate cause of action pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, to remedy Defendants' breach of their collective bargaining agreements by unilaterally terminating sick leave and disability benefits and otherwise refusing to honor employees' accrued benefits.

## PARTIES

1.      Darrell Pridy is a citizen of the State of Tennessee and resident of Cheatham County.   At all times relevant to this Complaint, Mr. Pridy has been employed by the Company and/or its predecessors and has participated in various employee benefit plans, including a welfare benefit plan for the Company employees providing sick leave and short-term disability benefits. Mr. Pridy is over the age of forty.

2.      Gregory Nabors is a citizen of the State of Tennessee and resident of Wilson County. At all times relevant to this Complaint, Mr. Nabors has been employed by The Company and/or its predecessors and has participated in various employee benefit plans, including a welfare benefit plan for the Company employees providing sick leave and short-term disability benefits. Mr. Nabors is over the age of forty.

2

3. Michael Sanders is a citizen of the State of Tennessee and resident of Robertson County. At all times relevant to this Complaint, Mr. Sanders has been employed by the Company and/or its predecessors and has participated in various employee benefit plans, including a welfare benefit plan for the Company employees providing sick leave and short-term disability benefits. Mr. Sanders is over the age of forty.

4. Randall Abston is a citizen of the State of Tennessee and resident of Davidson County. At all times relevant to this Complaint, Mr. Abston was employed by the Company and/or its predecessors and participated in various employee benefit plans, including a welfare benefit plan for the Company employees providing sick leave and short-term disability benefits. Mr. Abston is over the age of forty.

5. Local Union 702 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, AFL-CIO is a labor organization located in Nashville, Tennessee.

6. Piedmont Gas is an energy services Company registered to do business in the State of Tennessee and having its headquarters in Charlotte, North Carolina. Piedmont Gas's principal business is the distribution of natural gas to more than 1 million residential, commercial and industrial customers, as well as power plants, in Tennessee, North Carolina, and South Carolina. On October 3, 2016, Duke Energy acquired and became successor to Piedmont Gas, which is now a subsidiary and business unit of Duke Energy. Piedmont Gas may be served through its registered agent, CT Corporation System, at 300 Montvue Road, Knoxville, Tennessee 37919.

7. Duke Energy is a public Company incorporated in Delaware, which operates a business unit called Piedmont Gas, which is registered to do business in the State of Tennessee. Its headquarters is in Charlotte, North Carolina. Duke Energy may be served through its registered

3

agent, Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

## JURISDICTION

8.     This Court has jurisdiction over Plaintiffs' claims pursuant to 29 U.S.C. § 1132(e)(1), 29 U.S.C. § 185(c) and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Named Participants' claims under Tennessee law pursuant to 28 U.S.C. §1367.

9.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2), as all parties are found in this district, Defendants' breach occurred in this district, Named Participants are employed in this district, and Local 702 performs its duties as bargaining representative in this district.  Venue is also proper under 28 U.S.C. § 1391(a).

## FACTUAL ALLEGATIONS REGARDING THE COMPANY'S CONDUCT

10.     Piedmont Gas's principal business is the distribution of natural gas to more than 1 million residential, commercial and industrial customers, as well as power plants, in Tennessee, North Carolina, and South Carolina.  Duke Energy is one of the largest electric power holdings companies in the United States, providing electricity to 7.6 million retail customers in the United States.  Duke Energy owns and operates numerous diverse power generation assets in North America.  As of December 31, 2017, Duke Energy had operating revenues of $23.6 billion, owned assets of $138 billion, and employed 29,060 individuals.

11.     Named Participants began their employment with the Company when it was Nashville Gas Company.   Nashville Gas Company was acquired by and became a division of Piedmont Gas.  On October 3, 2016, Duke Energy acquired and became successor to Piedmont Gas, which is now a subsidiary and business unit of Duke Energy.  As explained below, Duke

4

Energy is an alter ego and/or successor in liability to Piedmont Gas, and as such is obligated and bound by the applicable collective bargaining agreements described below.

12.     Mr. Pridy began his employment with the Company in 1984.

13.     Mr. Nabors began his employment with the Company in 1993.

14.     Mr. Sanders began his employment with the Company in 1987.

15.     Mr. Abston began his employment with the Company in 1979 and retired from employment in August 2018.

16.     At all times during their employment, Named Participants were members of Local Union 702 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, AFL-CIO ("Local 702") and were represented by Local 702 in collective bargaining.

17.      At all times during their employment, the Company was and continues to be a party to a collective bargaining agreement with Local 702.  Defendant Duke Energy is also a party to the collective bargaining agreements with Local 702 on the basis that it is an alter ego and/or successor in liability to Piedmont Gas.

18.     The collective bargaining agreements over the years have created or incorporated a number of employee benefit plans.

19.     One such benefit is a sick leave and short-term disability benefit.     Upon information and belief, the collective bargaining agreement in effect from 1989 to 1992 ("1989 CBA") between the Company and Local 702 established a sick leave and short-term disability benefit plan ("Plan"), which Plan is governed by Section X of the same document.   Section X of the 1989 CBA is attached here as **Exhibit A**.  Section X of Exhibit A and successive collective bargaining agreements are the governing Plan documents.

20.     The Plan allowed a participant to accrue sick leave days as they worked for the Company and bank those accumulated days.  The 1989 CBA refers to this accrued leave account as a "sickness allowance."  Upon information and belief, employees participating in the Plan actively accrued sick leave time until December 31, 2004.

21.     The collective bargaining agreement between the Company and Local 702 in effect from August 1999 to August 2004 ("1999 CBA") is the last agreement to provide for accrual of banked Plan hours, which is also contained in Section X.  Section X of the 1999 CBA is attached here as **Exhibit B**.    Subsequent collective bargaining agreements refer to individual accrued benefit accounts as the "Leave Bank."

22.     The Plan details eligibility requirements for benefits, calculation of benefits, claims for benefits, and administration of the Leave Bank.  It requires the Company to administer the accrual of benefits in the Leave Bank using Company payroll and leave records. Exhibit B, Section X(k).

23.     Use of Plan benefits was limited to certain types of illnesses and situations.  For example, the Plan document delineates how many hours of sick leave can be used for scheduled medical appointments, how many hours can be used for illnesses and injuries, and how many can be used in the case of an "emergency illness" of a close family member.

24.     The Plan document gave the Company substantial discretion to make claims determinations.   For example, it gives the Company, as administrator, the discretion to "require employees to furnish a certificate from a doctor designated by the Company and other evidence of disability satisfactory to the Company."  Exhibit B, Section X(e).

25.     The Plan document also rewarded participants who did not utilize accrued sick or disability leave in a calendar year.   Exhibit B, Section X(i), (j).

6

26.    As of December 31, 2004, the Company amended the Plan to eliminate the accumulation of hours in Leave Banks going forward.   However, the Company allowed participants with hours already accrued in their Leave Banks to continue to carry over and use that time as described in the collective bargaining agreement between the Company and Local 702 effective August 2004 through August 2008 ("2004 CBA").   In other words, the Company recognized the Leave Banks as accrued benefits that could not be cut back or reduced.

27.    Article X, Sick Leave/Short-term Disability, of the 2004 CBA provides in relevant part (emphasis added):

> Employees are credited with 12 days of sick leave each January 1 to be taken as needed for any period of illness during the calendar year.  They may also use any ***accrued*** sick days in their Leave Bank (sick leave earned before January 1, 2005) when all of their annual sick days have been used or for a certified FMLA Leave to care for an immediate family member.  Banked days may also be used to cover the waiting period before short-term disability benefits begin.

28.    The Company also recognized participants' accrued Leave Banks in both the collective bargaining agreement between the Company and Local 702 effective August 2008 through August 2012 ("2008 CBA") and the collective bargaining agreement between the Company and Local 702 effective August 2012 through August 2018 ("2012 CBA").

29.    The Company administered and accounted for Named Participants' and similarly-situated persons' individual Leave Banks through an online portal called My Time, in which employees could log on and review their pay and benefits.  This portal showed an individual's Leave Bank as a "sick reserve" and showed credits and debits in the account.   The employee could also request to use those benefits through My Time.

30.    Upon information and belief, in April 2018, the Company removed the "sick reserve" function from My Time and began refusing to honor the accrued time in Named

7

Participants' and similarly situated employees' Leave Banks. The Company gave Named Participants no notice of this action.

31.    Plaintiff Abston requested to use time from his Leave Bank in late-April 2018, but was told by his supervisor that the Company no longer allowed employees to use those benefits.

32.    As of the date the Company removed the sick reserve from the online portal, Plaintiff Pridy had approximately 550 hours in his Leave Bank; Plaintiff Nabors had 993.50 hours; Plaintiff Abston had 953 hours, and Plaintiff Sanders had 974 hours in his Leave Bank.

33.    During negotiations leading to the formation of a new collective bargaining agreement in mid-2018, the Company (represented by officials with both Piedmont Gas and Duke Energy) and Local 702 did not bargain over sick leave and short-term disability benefits that were owed under prior collective bargaining agreements; instead, the Company unilaterally informed Local 702 that it would no longer honor accrued Leave Bank benefits in the new collective bargaining agreement, and unilaterally chose to deny accrued Leave Bank benefits to Named Participants and Class members.

34.    It would be futile for Named Participants and Class members to attempt to exhaust their administrative remedies under the Plan, because the Plan does not provide for such an administrative mechanism.

35.    Upon information and belief, 64 employees had accrued sick leave and short-term disability benefits in their Leave Banks when the Company ceased honoring accrued Bank benefits in Spring 2018.

36.    Upon information and belief, all employees who had accrued sick leave and short-term disability benefits in their Leave Banks when the Company ceased honoring accrued Bank benefits in Spring 2018 were over the age of forty.

## FACTUAL ALLEGATIONS REGARDING DUKE ENERGY AS THE ALTER EGO OR SUCCESSOR IN LIABILTIY TO PIEDMONT GAS

37.     Although it continues operations in its own name and is the signatory to the operative collective bargaining unit with the Union, Piedmont Gas does not operate separately from its parent company, Duke Energy. There is substantial overlap in their identity and operations such that Duke Energy functions as the alter ego and/or successor in liability to Piedmont Gas with respect to the bargaining unit.

38.     Piedmont Gas merged with Duke Energy effective October 3, 2016.

39.     The merger resulted in Piedmont Gas losing all of its shareholders, whose interests were cashed-out in the transaction.   The Company that remained was therefore wholly-owned by Duke Energy.

40.     The Company shares the same corporate governance as Duke Energy.  Following the closing of the merger, Duke Energy added Piedmont's then-current Chairman, President, and Chief Executive Officer, Thomas E. Skains, to the Duke Energy Board of Directors.

41.     The Company was represented by both Piedmont Gas and Duke Energy management at the negotiations which resulted in the operative collective bargaining agreement.

42.     Although Piedmont Gas retained its name, it operates "as a business unit of Duke Energy."[1]

---

[1] https://news.duke-energy.com/internal_redirect/cms.ipressroom.com.s3.amazonaws.com/259/files/20196/192122-piedmont-natural-gas-fact-sheet-final.pdf

9

43.     Since the merger on October 3, 2016, Duke Energy has integrated Piedmont's corporate functions – such as accounting, human resources and information technology – into its own operating structure.[2]

44.     The fact that Piedmont Gas and Duke Energy operate as a single business enterprise is demonstrated, in part, by the fact that they represent to their employees and the public that "Piedmont Gas" can be identified as "Duke Energy," and that they are effectively alter egos of one another.

45.     The Company's employees receive their paycheck from Duke Energy. For example, on the payslip provided to Named Participants and other non-management Piedmont Gas employees, the payor appears as "Piedmont Natural Gas Company, Inc.," however the payor address is listed as Duke Energy's corporate headquarters at the Duke Center, 550 South Tryon Street, Charlotte, North Carolina.

46.     The Company's employees receive their pension and savings plan benefits from Duke Energy.  After Piedmont Gas was acquired by Duke Energy, Named Participants and other non-management Piedmont Gas employees ceased to be enrolled in the Retirement Plan of Piedmont Natural Gas Company, Inc. and the Piedmont Natural Gas Company, Inc. 401(k) Plan for their pension and savings plan benefits, respectively.  Instead, following the merger Company employees became enrolled in the Duke Energy Retirement Cash Balance Plan and the Duke Energy Retirement Savings Plan.  Additionally, Company employees may obtain coverage under Duke Energy's other welfare plans, such as life insurance.

---

[2] https://news.duke-energy.com/releases/duke-energy-completes-acquisition-of-piedmont-natural-gas

47.     The Company's workplace rules and policies are explicitly labeled "Duke Energy" policies.  For example, after the enactment of the last collective bargaining agreement, the Piedmont Gas policy manual established that all regular full-time employees must use the "Duke Energy Sick and Family Care Pay" policy.

48.     The Named Participants and other employees also wear identification badges with their name and picture labeled with the name "Duke Energy," such that when they are in the field the public would identify them as Duke Energy employees.

49.     In addition to the fact that that Defendants Piedmont Gas and Duke Energy are virtually inseparable as far as Named Participants and that class are concerned, Piedmont Gas's public website makes no distinction between itself and Duke Energy, and in fact, expressly refers the public to Duke Energy emails and website domains for information about the Company.

50.     For example, Piedmont Gas's website lists the email for Customer Service as customerselfservice@duke-energy.com.

51.     Piedmont         Gas's         website        page         for        job        openings (http://www.piedmontng.com/about/aboutpng/careers/careers.aspx) redirects   you   to   Duke Energy's Careers page (https://www.duke-energy.com/our-company/careers).

52.     Piedmont Gas's website also lacks its own news portal, such that when the public visits for "the latest news from Piedmont Natural Gas," they are instructed to "please visit the Duke Energy News Center."

53.     These facts demonstrate that the Company represents to both its employees and the public that it shares an identity with Duke Energy, which functions as the alter ego and/or successor in liability to Piedmont Gas, and as such is party to and/or bears successor liability with respect to the applicable collective bargaining agreements between the Company and the Union.

11

## CLASS ALLEGATIONS

54.     Named Participants seek relief from the wrongdoing of the Company for themselves and for all those individuals similarly situated through Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following class:

> All non-management employees of Piedmont Natural Gas Company, Inc., as of April 1, 2018 having non-zero balance Leave Bank accounts.

55.     The putative classes meet the statutory prerequisites of Fed. R. Civ. P. 23(a), as set forth herein.

56.     As of early 2018, the date that the Company unilaterally terminated Leave Bank benefits, there were at least 64 employees with accrued Leave Bank time in their individual accounts. Members of the class are so numerous that joinder of all members would be impracticable.

57.     The number and identity of putative class members is easily ascertainable through discovery.  Any notice to class members could be given through the already-established channels the Company uses to communicate with employees, retirees, and Local 702.  Additionally, the Company maintained records of individual Leave Bank accounts through which class members may also be easily identified.

58.     Named Participants' claims are typical of the claims of the class, as the Company's duties and liabilities to Named Participants are identical to their duties and liabilities to the class. Named Participants will fairly and adequately represent the interests of all class members, and they

12

have retained counsel with competence and experience in class action, ERISA, and THRA litigation.

59.     Named Participants' and class members' claims involve common questions of both law and fact.  The facts relevant to this action relate simply to the relevant collective bargaining agreements, the bargaining of those agreements, the administration of the Plan, and ultimately the failure to honor Plan benefits accrued by the Named Participants and other class members. Additionally, all affected class members are long-term employees over the age of forty.  The injuries sustained by Named Participants and all putative class members flow from a common nucleus of operative facts – the Company's fiduciary and contractual failings, namely their failure to honor the Leave Bank benefits conferred on all class members, as well as the Company's discriminatory treatment of the class as a whole, all of whom are over the age of forty.  Similarly, this action raises common questions of law regarding the rights and benefits due Named Participants and class members under the Plan and the CBAs, and the duties owed by the Company to the class members as fiduciaries of the Plan and the execution of those duties.

60.     The Company's actions are uniform across the class.  The Company was a party to several consecutive collective bargaining agreements which created the benefits and governed the Plan for all class members.  The Company then unilaterally decided not to honor any of the Leave Bank benefits accrued by class members under the prior collective bargaining agreements and recognized by subsequent collective bargaining agreements.  The Company took actions, as a fiduciary and a contracting party, that affected members of the classes uniformly.  Therefore, all class members have sustained damages that are uniform in nature, in that all class members were deprived of vested and accrued Plan benefits.

13

61.     Allowing these claims to proceed individually exposes the Company to the risk of inconsistent judicial interpretations of the singular terms of the collective bargaining agreements at issue should two or more employees bring their claims simultaneously in different courts, thereby creating incompatible standards of conduct for the Company. Individual litigation would also be duplicative, as Named Participants bring this suit to clarify and enforce their rights to accrued sick leave benefits under the terms of the Plan, or to obtain equitable relief to restore them to the position in which they would have been but for the Company's violation of Plan terms and contractual obligations, and to enforce their rights under Tennessee laws prohibiting age discrimination.

62.     Named Participants will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class actions. Named Participants have no interests antagonistic to those of other members of the Class. Named Participants are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

63.     This action may be properly certified under either subsection of Rule 23(b)(1). Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for The Company. Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

64.     In the alternative, certification under Rule 23(b)(2) is warranted because The Company has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

65.     In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## CAUSES OF ACTION

### COUNT I
**Clarification and Enforcement of Rights by Named Participants and the Class**
**(29 U.S.C. § 1132(a)(1)(B), (a)(3))**

66.     Named Participants incorporate the foregoing paragraphs into this Count as if fully re-alleged herein.

67.     Plaintiffs Pridy, Nabors, Sanders and Abston bring this claim against The Company on behalf of themselves and all putative Class members.

68.     The Company is an "employer" as that term is defined in Section 3 of ERISA, 29 U.S.C. § 1002(5).

69.     The Company's sick leave and short-term disability Plan is an ERISA-qualified welfare benefit plan as defined by 29 U.S.C. § 1002(1).  It was established and maintained by The Company for the purpose of providing benefits to participating employees in the event of sickness, accident or disability.

15

70. At all times relevant, Named Participants and putative Class members were "employees" of The Company and "participants" of the Plan as those terms are defined in Section 3 of ERISA, 29 U.S.C. § 1002(6), (7).

71. Named Participants and Class members have nonforfeitable, accrued rights to banked sick and disability leave benefits by virtue of the terms of the governing Plan documents and the contractual commitment by the Company to provide and not reduce those benefits.

72. The Company's refusal to provide vested and accrued Plan benefits in violation of the plain terms of the Plan constitutes a wrongful denial of benefits.

73. Named Participants bring this suit to clarify and enforce the rights of Class members to accrued benefits under the terms of the Plan, and to obtain equitable relief to restore them to the position in which they would have been but for the Company's violation of Plan terms.

74. The Company has made it administratively impossible for Named Participants or other Class members to file for Plan benefits, and thus Named Participants are deemed to have exhausted any and all administrative remedies under the Plan.

<u>**COUNT II**</u>
**Violations of the Tennessee Human Rights Act by Named Participants and the Class**
**(Tenn. Code Ann. § 4-21-401)**

75. Named Participants incorporate the foregoing paragraphs into this Count as if fully re-alleged herein.

76. Plaintiffs Pridy, Nabors, Sanders and Abston bring this claim against the Company on behalf of themselves and all putative Class members.

77. The Company is an employer, as defined by Tenn. Code Ann. § 4-21-102, and are otherwise covered by and subject to the provisions of the Tennessee Human Rights Act ("THRA").

16

78.     Under the THRA, "[i]t is a discriminatory practice for an employer to ... discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's ... age." Tenn. Code Ann. § 4–21–401(a)(1).

79.     The Company controlled the terms of employment for Named Participants and the Class members during the relevant period, including employee benefits.

80.     Named Participants and the Class members are, upon information and belief, all over the age of forty.  In fact, they are the most senior employees of the Company in Nashville.

81.     Named Participants and the Class members, as employees of The Company, earned and were entitled to the benefits provided to them pursuant to the Plan.

82.     The Company violated Tenn. Code Ann. § 4-21-401 by discriminatorily eliminating employee benefits as to only its oldest employees.  The Company did not reduce sick or disability benefits for younger employees.

83.     Age was a primary motivating factor in the Company's decision to eliminate sick and disability benefits for the Class, because the only employees affected by the Company's adverse employment action were, upon information and belief, over the age of forty, and who had the most seniority with The Company.

84.     The Company was also motivated to eliminate Plan benefits for reasons related to age because Named Participants and the Class, as employees over the age of forty, are far more likely than younger employees to use sick and disability benefits for the treatment of their medical conditions.

85.     By reason of the continuous nature of The Company's discriminatory conduct, which persists through the present, Named Participants and the Class are entitled to application of the continuing violation doctrine to all violations of the THRA.

86.     As a result of The Company's discriminatory conduct, continuing to deny accrued Plan benefits to participants, Named Participants and the Class have suffered and continue to suffer harm, including but not limited to lost wages and earnings and other financial loss, as well as humiliation, embarrassment, emotional distress, and mental anguish.

87.     Named Participants and the Class are entitled to all remedies available for violation of the THRA, including, but not limited to those damages provided in Tenn. Code Ann. § 4-21-311.

**COUNT III**
**Breach of Contractual Duty by Local 702**
**(29 U.S.C. § 185)**

88.     Plaintiff Local 702 incorporates the foregoing paragraphs into this Count as if fully re-alleged herein.

89.     Plaintiff Local 702, the exclusive bargaining representative of Named Participants and Class members at all times relevant, brings this claim against The Company.

90.     The collective bargaining agreements described herein as providing accrual of sick leave benefits are "contract[s] between an employer and a labor organization" within the meaning of Section 301 of the LMRA, 29 U.S.C. § 185.  The CBAs are all binding agreements between The Company and Local 702, which is the exclusive collective bargaining agent for Named Participants and Class members.

91.     The CBAs conferred upon Named Participants and all Class members a contractual right to "accrued" sick leave and disability benefits.  The nonforfeitable nature of those accumulated benefits is evidenced by the plain language of the agreements, which designate Leave Bank benefits as "accrued," and the fact that the Company continued to honor accrued Leave Bank benefits over the course of 14 years and through 3 separate agreements.

18

92.     The Company breached those agreements by unilaterally terminating Named Participants' Leave Banks and otherwise refusing to honor Named Participants' and Class members' accrued benefits established under these agreements.  This breach of the parties' agreements is actionable under the LMRA.

93.     Under Article XII of the 2018 (current) CBA, disputes subject to the grievance procedure, or administrative remedy, are limited to "any disagreement or dispute aris[ing] between the parties hereto, as to the meaning or interpretation of the terms of this Agreement, or as to the rights of either party hereunder."

94.     No provision in the 2018 CBA explicitly or implicitly references or incorporates accrued sick leave, sick bank, or leave bank benefits. Because the 2018 CBA does not contain any of these terms, it would have been futile for Local 702, the Named Participants, or putative Class members to obtain relief through the grievance procedure or exhaust their administrative remedies.

95.     The collective bargaining agreement covers only bargaining unit members, who are employed by the Company, and does not cover retirees, who are no longer employed and thus do not have standing to file grievances or legally obligate Local 702 to file grievances on their behalf. Other than filing suit, retired Class members, who were denied the ability to use their Leave Bank benefits and left employment after April 2018, have no other ability to seek redress for the Company's failure to honor their accrued sick leave, which would have resulted in a loss in pay while out on sick leave or short term disability.

## COUNT IV
### For Liability on Behalf of Defendant Duke Energy
### Under Veil-Piercing/Alter Ego Theory

96.     Plaintiffs incorporate the foregoing paragraphs into this Count as if fully re-alleged herein.

19

97.    Following the merger with Defendant Duke Energy, Defendant Piedmont Gas continued to operate under its name but ceased to operate separately from Defendant Duke Energy, and adopted Defendant Duke Energy's business operations and identity as its own.

98.    Defendant Duke Energy exercised dominion over the business operations of Defendant Piedmont Gas in respect to the alleged facts, and such domination was used to commit the violations against Plaintiffs and the Class, resulting in the injuries alleged in this complaint.

99.    Defendant Duke Energy is liable for the violations and wrongs set forth in this Complaint because the alleged facts show that it is merely the alter ego of Piedmont Gas, the individuals and the company being inextricably commingled from one another in management, business, operation, and ownership.

100.    For these reasons, Defendant Duke Energy should be held jointly and severally liable with Piedmont Gas for the conduct alleged in this Complaint.

## COUNT V
### For Liability on Behalf of Defendant Duke Energy as Successor In Interest to Defendant Piedmont Gas

101.    Plaintiffs incorporate the foregoing paragraphs into this Count as if fully re-alleged herein.

102.    After the merger in which it wholly-acquired Defendant Piedmont Gas, Defendant subsumed the business operations of the original entity known as Piedmont Gas.  In so doing, Defendant Duke Energy effectively replaced Piedmont Gas as the Company and employer of Named Plaintiffs and signatory to the applicable collective bargaining agreements.

103.    Under the facts alleged here, equity and justice demand that Defendant Duke Energy be found liable as successor in interest to the applicable collective bargaining agreements between the Company and the Union.

20

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court:

A.      Certify this action as a class under Fed. R. Civ. P. 23, appoint Named Participants as Class Representatives, and appoint the undersigned as Class counsel;

B.      Enjoin the Company to restore accrued Plan benefits to individual Named Participants and Class Members, after appropriate accounting, or otherwise enforce the terms of the Plan and the applicable collective bargaining agreements;

C.      An award to Named Participants and the Class of damages for lost employment benefits against The Company as allowed by the THRA;

D.      Award Local 702 all appropriate remedies available under the LMRA;

E.      Award Plaintiffs their reasonable attorneys' fees and costs incurred in this action;

F.      Grant such further, equitable and/or other relief as it may deem appropriate.

DATE:  December 10, 2019                  Respectfully submitted,


*/s/ Joe P. Leniski, Jr*
Joe P. Leniski, Jr. (BPR#22891)
Karla M. Campbell (BPR #27132)
BRANSTETTER STRANCH & JENNINGS, PLLC
The Freedom Center
223 Rosa L. Parks Ave., Suite 200
Nashville, Tennessee 37203
(615) 254-8801
joeyl@bsjfirm.com
karlac@bsjfirm.com

*ATTORNEYS FOR PLAINTIFFS*

21

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 10th day of December, 2019, the foregoing document was filed using the Court's CM/ECF filing system.

*/s/ Joe P. Leniski, Jr.*
JOE P. LENISKI, JR.