# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DARRELL PRIDY, GREGORY NABORS, )
MICHAEL SANDERS, and RANDALL )
ABSTON, on behalf of themselves and all )
others similarly situated, )
           )
    **AND** )
           )
LOCAL UNION 702 OF THE UNITED )
ASSOCIATION OF JOURNEYMEN )
AND APPRENTICES OF THE PLUMBING )
AND PIPEFITTING INDUSTRIES, )    **No. 3:19-cv-00468**
           )    **District Judge Aleta A. Trauger**
    **Plaintiffs,** )
           )    **CLASS ACTION**
**v.** )    **JURY DEMAND**
           )
PIEDMONT NATURAL GAS COMPANY, )
INC. )
           )
    **AND** )
           )
DUKE ENERGY CORPORATION, )
as the alter ego or successor in liability to )
PIEDMONT NATURAL GAS COMPANY, )
INC. )
           )
    **Defendants.** )

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

Defendants Piedmont Natural Gas Company, Inc. ("Piedmont Gas") and Duke Energy

Corporation ("Duke Energy") (collectively, "Defendants") have moved the Court pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure to dismiss each of the five claims asserted by

Plaintiffs Local Union 702 of the United Association of Journeymen and Apprentices of the

Case 3:19-cv-00468   Document 30   Filed 01/13/20   Page 1 of 26 PageID #: 307

Plumbing and Pipefitting Industries (the "Union") and Darrell Pridy, Gregory Nabors, Michael Sanders, and Randall Abston (collectively, the "Individual Plaintiffs").

## I.     Introduction

This lawsuit appears to be the result of some of the Union's members being dissatisfied with the bargain their Union made with Piedmont Gas in April 2018.  In a prior collective bargaining agreement ("CBA"), Piedmont Gas and the Union agreed to allow bargaining unit employees to accrue sick leave, and to "bank it," carrying it over from year to year.  In subsequent CBAs, Piedmont Gas and the Union adopted a different sick leave policy, and stopped further accruals to sick leave banks, but again agreed to allow bargaining unit employees to maintain their previously-banked sick leave.  Those agreements are reflected in the parties' CBAs.  In April 2018, after engaging in collective bargaining, Piedmont Gas and the Union entered into the current generation CBA which changed the overall leave benefits for bargaining employees.  Going forward, sick leave would be governed by Piedmont Gas's Sick and Family Care Pay Policy, other paid leave benefits (like parental leave) were added, and previously-recognized sick leave banks were retired.  Defendants first learned of this dispute nearly a year later when this lawsuit was threatened against Duke, Piedmont Gas's corporate parent.  The claims made in this lawsuit have never been raised through the Union's and Piedmont Gas' contractual dispute resolution process.

Plaintiffs' claims, as pled, fail for multiple reasons dictating dismissal of this action:  First, Duke Energy has never employed Piedmont Gas's employees or engaged in collective bargaining with the Union on their behalf.  Duke Energy is Piedmont Gas's corporate parent, not its alter ego nor its legal successor. Even accepting Plaintiffs' pled factual allegations as true, Plaintiffs fail to state a claim against Duke Energy.  Second, the Union's breach of contract claim and the Individual Plaintiffs' claim made pursuant to the Employee Retirement Income Security Act of 1974

4816-7605-2144.2

2

("ERISA") both fail because neither have previously been raised through the parties' contractual dispute resolution process. Third, the Individual Plaintiffs' ERISA claim fails to state a claim because the sick leave program at issue was a "payroll practice" not an ERISA-governed welfare plan. Fourth, the Individual Plaintiffs' age discrimination claim is preempted by § 301 of the Labor Management Relations Act ("LMRA").

## II. Factual Background[1]

### A. Duke Energy acquires Piedmont Gas in 2016.

Duke Energy is an American electric power holding company. (2nd Am. Compl. at ¶¶ 7, 10). In 2016, it acquired Piedmont Gas. (*Id.* at ¶ 11). Piedmont Gas thereafter became a subsidiary of Duke Energy, although it remains a separately incorporated entity. (*Id.*).

To support their argument that Piedmont Gas and Duke Energy are predecessor/successor entities and/or "alter egos" of each other, Plaintiffs rely upon the following allegations: Piedmont Gas does not operate separately from Duke Energy, (*Id.* at ¶ 37); Piedmont Gas merged with Duke Energy,[2] (*Id.* at ¶ 38); Piedmont Gas is wholly owned by Duke Energy, (*Id.* at ¶ 39); Piedmont Gas shares the same corporate governance as Duke Energy, (*Id.* at ¶ 40); Piedmont Gas operates as a business unit of Duke Energy, (*Id.* at ¶ 42); Piedmont Gas employees receive their paychecks, pensions, and savings plans benefits from Duke Energy, (*Id.* at ¶¶ 45-46); and Piedmont Gas' website does not distinguish between Piedmont Gas and Duke Energy, (*Id.* at ¶¶ 49-52).

---

[1] The facts summarized herein are taken from the Second Amended Complaint and are accepted as true for purposes of this motion only.

[2] As a matter of corporate law, the legal effect of a merger is that two distinct legal entities "merge" to become a single legal entity. *See, e.g.*, *Performance Sys., Inc. v. U.S.*, 382 F. Supp. 525, 531 (M.D. Tenn. 1973). As discussed more fully herein, the Court need not accept Plaintiffs' pled legal conclusions -- like the existence of a merger -- as true. Regardless, this pled legal conclusion is contradicted by Plaintiffs' other pled allegations. Duke Energy and Piedmont Gas did not merge into a single entity because, as Plaintiff's effectively concede in their pleading, both entities exist separately.

For many years prior to the acquisition (and since), Piedmont Gas's bargaining unit employees have been represented by the Union. (*Id.* at ¶ 16). The terms and conditions of employment for those bargaining unit employees have been governed by a series of CBAs negotiated between Piedmont Gas and the Union. (*Id.* at ¶¶ 16-32).

**B.     The parties' various collective bargaining agreements include private contractual dispute resolution remedies.**

Plaintiffs trace their legal theories back to the CBA between the Union and Piedmont Gas in effect from 1989 to 1992 (the "1989 CBA"), (*id.* at ¶ 19), and excerpts of the 1989 CBA and subsequent 1999 CBA. (*See id.* at Exs. A, B). Defendants attach hereto complete copies of the 2004 CBA, the 2008 CBA, the 2012 CBA, and the current generation 2018 CBA. **(*See* Exhibits 1-4).**

Each CBA contained a provision governing the settlement of disputes arising under the CBA. In the 2018 CBA,[3] that provision is found at Article XII, and includes a multi-step dispute resolution process that is mandatory unless waived by mutual consent. (2018 CBA, Ex. 4 Art. XII at 13).

At the first step, a grievance must be raised within five working days after the action giving rise to the grievance, which results in a discussion between "the employee concerned and/or the Union Representative(s) and the employee's immediate Supervisor/Manager." If the grievance is not resolved through that discussion, then within five working days, the Union must submit the matter in writing to the relevant Manager, and the Manager must thereafter respond within five working days. Grievances that are not resolved at the first step go to the second step.

---

[3] The 2018 CBA expressly supplants all prior CBAs, (*see* 2018 CBA, Ex. 4 at 1), and thus contains the operative dispute resolution provision.

At the second step, the Union must appeal the Manager's decision in writing to the Managing Director within ten working days. A meeting must take place between the Union Committee and the Managing Director within ten working days of the appeal, after which the Managing Director must respond within five working days. Grievances that are not resolved at the second step go to the third step.

At the third step, the Union must appeal in writing the Managing Director's decision to the Managing Director for Human Resources within five working days. A meeting must take place between the Union Committee and the Managing Director for Human Resources within fifteen working days of the appeal, after which the Managing Director for Human Resources must respond within ten working days.

Grievances that are not resolved after the third step may be submitted to arbitration at the written request of either party. If the aggrieved party fails to submit the grievance in writing or fails to appeal to the next step of the procedure within the time limit provided, the grievance shall be deemed not to exist and no action shall be taken by either party.

**C.    In 1989, the Union and Piedmont Gas negotiate a sick leave benefit for employees.**

The Union's various CBAs with Piedmont Gas address customary topics of collective bargaining, including employee benefits. One such benefit is paid sick leave. In Article X of the 1989 CBA, the Union and Piedmont Gas agreed to a sick leave provision according to which employees accrued a given amount of paid leave (based on length of service) to continue their wages in the event of absences "because of illness, or a noncompensable injury." (*See* 1989 CBA, 2nd Am. Compl. Ex. A, Art. X at 22-25). Article X on its face does not establish a trust or a fund of any nature because sick leave is merely one of several benefits to provide wage continuation for certain absences, (*see id.*), and Plaintiffs do not allege otherwise, (*see generally* 2nd Am. Compl.).

As of the Union's and Piedmont Gas's 1999 CBA, the parties continued to provide contractual sick leave in the event of "bona fide personal illness" to provide "pay for the time they would have regularly worked." (*See* 1999 CBA, 2nd Am. Compl. Ex. B, Art. X at 32). From 1989 through the 1999 CBA, employees were permitted to carry over accrued sick leave from year to year, maintaining their cumulative available leave in a "sick leave bank." (2nd Am. Compl. at ¶ 20).

**D.   In 2004, the Union and Piedmont Gas negotiate a different sick leave benefit for employees.**

In 2004, the Union and Piedmont Gas negotiated a different sick leave provision. Effective January 1, 2005, employees were credited with 12 days of sick leave for use in certain circumstances throughout the year, but those credited days could not be carried over to the next year. (*See* 2004 CBA, Ex. 1 Art. X at 22). Employees were also for the first time offered a short term disability benefit. (*Id.* at 21). In addition, while no additional leave could be added to employees' prior sick leave banks, the Union and Piedmont Gas agreed that employees could continue to maintain their prior sick leave banks, (*see id* at 20).

The Union and Piedmont Gas negotiated similar sick leave and short term disability provisions in their 2008 and 2012 CBAs. (*See* 2008 CBA, Ex. 2 Art. XVI at 18-20; 2012 CBA, Ex. 3 Art. XVI at 18-19).

**E.   In 2018, the Union and Piedmont Gas once again negotiate a different sick leave benefit.**

On April 14, 2018, after customary negotiations, the Union and Piedmont Gas entered into a new CBA. Plaintiffs allege that, during negotiations, Piedmont Gas did not bargain over sick leave benefits. (2nd Am. Compl. at ¶ 33). That allegation is disputed. What is indisputable, however, is that the 2018 CBA, to which the Union agreed, removes any continuation of

4816-7605-2144.2

6

recognition of sick leave banks, and provides the following as the parties' contractual sick leave benefit:

ARTICLE XVI
**SICK LEAVE**

> Sick time shall be in accordance with the Company's Sick and Family Care Pay Policy, or successor policies as amended from time to time. It is agreed that no changes will be made without prior notification and the opportunity for full discussion with the Union.

(2018 CBA, Ex. 4 Art. XVI at 19). That change was accompanied by other changes to leave benefits in the 2018 CBA, including the addition of parental leave, (*id.*, Art. CVII at 20), and enhanced bereavement leave, (*id.,* Art. XIX at 21).

Neither the Union, who entered into the 2018 CBA, nor the Individual Plaintiffs on whose behalf the Union negotiated the 2018 CBA, allege that they grieved Piedmont Gas's administration of sick leave consistent with the operative sick leave provision after the 2018 CBA went into effect. In fact, the first Piedmont Gas learned of a potential dispute was in mid-2019 when Plaintiffs informed Duke Energy of this threatened action.

### III.    <u>Argument</u>

**A.**    **Standard of review.**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Further, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* "[A] court considering a motion to dismiss can

choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.

**B.     Duke Energy is not a proper party to this action.**

Plaintiffs' claims arise out of contracts between the Union and Piedmont Gas, not Duke Energy. (*See, e.g.*, 2018 CBA). The facts pled regarding Duke Energy's legal relationship to Piedmont Gas as its corporate subsidiary do not establish Plaintiffs' legal conclusion that Duke Energy "is an alter ego and/or successor in liability to Piedmont Gas, and as such is obligated and bound by the applicable collective bargaining agreements described [in the Second Amended Complaint]." (2nd Am. Compl. at ¶ 11). As a matter of law, Duke Energy is Piedmont Gas's corporate parent, not its alter ego and/or legal successor.

> "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S. Ct. 1876, 1884 (1998).

Moreover, common ownership and control of two affiliated entities does not establish that one is responsible for the liabilities of the other: "[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *Bestfoods*, 524 U.S. at 61 (quoting *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 57 (2d Cir. 1988), *cert. denied*, 488 U.S. 852, 102 L. Ed. 2d 109, 109 S. Ct. 136 (1988)). "Control through the ownership of shares does not fuse the corporations, even when the directors are common to each." *Id.* (quoting *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir. 1929) (L. Hand, J.)).

4816-7605-2144.2

### 1.      Duke Energy is not Piedmont Gas's legal successor.

As Piedmont Gas's corporate parent, any alleged liability Duke Energy has for Piedmont Gas's obligations must arise, if at all, under a theory of corporate veil-piercing and not successor liability.  Successor liability and corporate veil-piercing are "separate legal doctrines"--the former addresses the relationship between a "corporation and its predecessor," and the latter the relationship between a "corporation and its current owner." *See In re Welding Fume Prods. Liab. Lit.*, 2010 WL 2403355, *8 (N.D. Ohio June 11, 2010).  "As courts within this circuit and elsewhere have recognized, '[s]uccessor liability enables claimants to seek recourse from the successor that has replaced or entirely taken over the original entity.' On the other hand, if the original entity has not gone anywhere, 'there is no successor—and no successor liability.'" *Pridy v. Duke Energy Corp.*, No. 3:19-cv-00468, 2019 U.S. Dist. LEXIS 205188 (M.D. Tenn. Nov. 26, 2019) (Trauger, J.) (citations omitted).

Here, the facts pled in the Second Amended Complaint do not state a claim for successor liability. Duke Energy did not "succeed" Piedmont Gas; it acquired it as a wholly owned subsidiary. The original entity has not gone anywhere. Piedmont Gas remains a fully functional, distinct legal entity, as evidenced by the fact Plaintiffs are currently suing Piedmont Gas over a collective bargaining agreement which the Union negotiated and entered into with Piedmont Gas in 2018, two years after the Duke Energy acquisition. Piedmont Gas now operates as a corporate subsidiary of Duke Energy. As a matter of law, this makes Duke Energy the corporate parent of Piedmont Gas, not its successor. Because there are no allegations (nor could there be) that Duke Energy succeeded Piedmont Gas, there can be no successor liability. Count V of the Second Amended Complaint (for Liability on Behalf of Defendant Duke Energy as Successor in Interest to Defendant Piedmont Gas) should accordingly be dismissed.

4816-7605-2144.2

9

2.     **Plaintiffs have not pled facts which, if true, would make Duke Energy Piedmont Gas's alter ego.**

The federal test[4] for piercing the corporate veil requires the district court to weigh "(1) the amount of respect given to the separate entity of the corporation by its shareholders; (2) the degree of injustice visited on the litigants by recognition of the corporate entity; and (3) the fraudulent intent of the incorporators." *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 703 (6th Cir. 1988).

The alter ego doctrine is an equitable doctrine "developed to prevent employers from evading obligations under the [National Labor Relations] Act merely by changing or altering their corporate form." *NLRB v. Allcoast Transfer*, 780 F.2d 576, 579 (6th Cir. 1986). In the labor context, the doctrine operates to bind an employer to a collective bargaining agreement if it is found to be an alter ego of a signatory employer. *See id.* at 582-83. Whether alter ego liability applies in ERISA actions is a question of federal common law. *Flynn v. Greg Anthony Constr. Co., Inc*., 95 F. App'x 726, 732 (6th Cir. 2003).

The Sixth Circuit customarily divides potential alter-ego operations into two possible circumstances: first, when the new entity begins operations but is "merely a disguised continuance of the old employer," and second, in a "double-breasted operation,"[5] where "two or more coexisting employers performing the same work are in fact one business, separated only in form." *See NLRB v. Fullerton Transfer & Storage Ltd., Inc*., 910 F.2d 331, 336 (6th Cir. 1990). In the labor law context, if a case "involves neither a disguised continuance situation nor a double-

---

[4] The standard for whether the Individual Plaintiffs can pierce the corporate veil on their THRA claim would be governed by state law. *See Corrigan, et al. v. United States Steel Corp.*, 478 F.3d 718, 724 (6th Cir. 2006).

[5] The Sixth Circuit has confronted two common fact patterns in "double-breasted operation" cases: (1) the "classic" double-breasting operation in which a union contractor creates a second, non-union company, and (2) the "reverse" double-breasting situation in which a non-union company opens a sister company that becomes a union signatory. Examples of each are discussed below.

4816-7605-2144.2

10

breasted operation . . . the alter ego doctrine is inapplicable." *Int'l Union, UAW v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005).

The Sixth Circuit has adopted the following factors from the National Labor Relations Board to analyze whether the alter ego doctrine applies: "whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." *Nelson Elec. v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981). No individual factor is outcome determinative; instead, "all the relevant factors must be considered together." *Allcoast Transfer*, 780 F.2d at 582.

Dismissal under Rule 12(b)(6) is appropriate where "the allegations in the amended complaint do not adequately plead the existence of an alter-ego operation." *Trs. of Detroit Carpenters Fringe Ben. Funds v. Patrie Constr. Co.*, 618 Fed. Appx. 246 (6th Cir. 2015). In applying the relevant factors, federal courts have held that "generalized and conclusory allegations regarding common ownership, employees, management, control, and decisionmaking . . . . are essentially a recitation of the legal standard and are plainly insufficient to state a claim of alter ego status." *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 15 (2d Cir. 2014); *see also Wehlage v. EmpRes Healthcare, Inc*., 791 F. Supp. 2d 774, 782-83 (N.D. Cal. 2011) (generalized allegations of common decisionmaking, operation, and shared "officers, directors and employees" are insufficient to invoke the alter ego doctrine); *Arctic Ocean Int'l, Ltd. v. High Seas Shipping Ltd*., 622 F. Supp. 2d 46, 54 (S.D.N.Y. 2009) (allegations consisting of little more than "labels and conclusions that reflect formulaic recitations of the elements of a cause of action" are insufficient to state an alter ego claim). An analysis of Sixth Circuit alter ego cases illustrates the circumstances where an alter ego finding is appropriate and where it is not, and confirms that this case falls into the latter category.

4816-7605-2144.2

**(a)**      **Cases finding alter ego.**

In *NLRB v. Borg Warner Corp*., 663 F.2d 666 (6th Cir. 1981) (per curiam), *cert. denied*, 457 U.S. 1105, 73 L. Ed. 2d 1313, 102 S. Ct. 2903 (1982), the Sixth Circuit found alter ego status where a parent corporation had merely transferred work from one organized subsidiary to another non-union subsidiary. There, the parent corporation created one subsidiary, Pony Express, to take over the courier service of another subsidiary, Wells Fargo, leaving Wells Fargo as a separate entity offering armored car services. Wells Fargo had a union collective bargaining agreement; Pony Express did not. The two companies shared a number of top executives as well as common offices, lock boxes, and post office boxes. The takeover of Wells Fargo's courier services was accomplished by a "paper" sale of assets to Pony Express which then repainted the Wells Fargo vans. Based on these circumstances, the court determined it was reasonable to conclude that the transfer of work from one affiliated entity to another was for the fundamental purpose of evading federal labor obligations.

Similarly, the Sixth Circuit found three corporations, A.E. Ward, Ward Moving, and Allcoast, to be alter egos in a paradigm example of classic double-breasting. *See NLRB v. Allcoast Transfer, Inc*., 780 F.2d 576 (6th Cir. 1986). Harris served as the CEO and principle shareholder of all three corporations. Harris began his operations with A.E. Ward. This corporation transported goods interstate under its own license, transported goods intrastate, and also transported goods interstate as an agent for Atlas Van Lines. As a result of an Atlas policy change, Harris divided his operations, establishing Ward Moving to ship as Atlas' agent. A.E. Ward continued its independent operations. A further change in Atlas policy required Harris to change the name of A.E. Ward to Allcoast Transfer. Allcoast continued to recognize the collective bargaining agreement executed by A.E. Ward, but Ward Moving did not. The Sixth Circuit found alter ego status based upon the

corporations' common management, operations, facilities, equipment and supervisory and operating and employees, and the fact that both Allcoast and A.E. Ward performed shipping as an agent for Atlas. *See id*. at 582.

    **(b)    Cases not finding alter ego.**

The Sixth Circuit analyzed the concept of "reverse double breasting" in *Trustees of the Resilient Floor Decorators Insurance Fund v. A&M Installations, Inc*., 395 F.3d 244 (6th Cir. 2005), ultimately concluding that the alter ego doctrine did not apply. In that case, a former employee of a non-union carpet sales company started a carpet installation company that hired union labor. The companies shared office and warehouse space and secretarial staff, and the president of the installation company was the former brother-in-law of the president of the sales company. *See id*. at 246-47. The Sixth Circuit found that the two companies were not alter egos, however, (1) because the non-union carpet sales company had no preexisting labor obligations to evade, (2) because there was no "pervasive intermingling of funds and operations" as found in other alter ego cases, and (3) because the installation company's workers were, in fact, independent contractors and not "employees" under ERISA. *See id*. at 248-49, 251.

If an alter ego claim is not supported by adequate factual allegations, dismissal is appropriate. *See, e.g.*, *Trs. of Detroit Carpenters Fringe Ben. Funds v. Patrie Constr. Co.*, 618 Fed. Appx. 246 (6th Cir. 2015) (affirming 12(b)(6) dismissal due to lack of factual support for claims that employer and another company operated as alter egos in order to evade obligations under CBA and ERISA); *Int'l Union, UAW v. Aguirre*, 410 F.3d 297 (6th Cir. 2005) (affirming district court's ruling on summary judgment that alter ego doctrine did not apply where case did not involve a disguised continuance or double-breasted operation); *Bd. of Trs. of the Cincinnati Plumbing & Pipe Fitting Indus. Promotion Trust Fund v. Humbert*, 768 Fed. Appx. 317 (6th Cir.

2019) (affirming district court's ruling on summary judgment that two companies were not alter egos since equipment, supervision, and ownership was not shared, each company managed its own trade work, each company had its own employees, the accounting firm maintained separate books for each business, and the companies had different purposes and customers); *Road Sprinkler Fitters Local Union No. 669 v. Dorn Sprinkler Co.*, 669 F.3d 790 (6th Cir. 2012) (affirming district court's ruling on summary judgment that two companies were not alter egos where six factors weighed against alter ego finding); *Southward v. South Cent. Ready Mix Supply Corp.*, 7 F.3d 487 (6th Cir. 1993) (affirming district court's ruling on summary judgment that successor company was not alter ego of predecessor, and thus successor employer was not bound to terms of predecessor's collective bargaining agreement).

  **(c) Duke Energy is not Piedmont's alter ego.**

  Here, Duke Energy is neither a "disguised continuance" of Piedmont nor a double-breasted operation. Plaintiffs allege, among other things, that Piedmont Gas does not operate separately from Duke Energy, (2nd Am. Compl. at ¶ 37); Piedmont Gas merged with Duke Energy, (*Id.* at ¶ 38); Piedmont Gas is wholly owned by Duke Energy, (*Id.* at ¶ 39); Piedmont Gas shares the same corporate governance as Duke Energy, (*Id.* at ¶ 40); Piedmont Gas operates as a business unit of Duke Energy, (*Id.* at ¶ 42); Piedmont Gas employees receive their paycheck, pension, and savings plan benefits from Duke Energy, (*Id.* at ¶¶ 45-46); and Piedmont Gas' website does not distinguish between Piedmont Gas and Duke Energy, (*Id.* at ¶¶ 49-52).

  Plaintiffs' allegations at paragraphs 37-53 of the Second Amended Complaint are naked assertions devoid of factual enhancement. "[B]ecause they are no more than conclusions, [they] are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. at 679. The bare allegation that "Piedmont Gas does not operate separately from its parent company, Duke Energy" (*see id.*

at ¶ 37) does not make it so, and without more, Count IV of the Second Amended Complaint (For Liability on Behalf of Defendant Duke Energy Under Veil-Piercing/Alter Ego Theory) must be dismissed.

Even accepting Plaintiffs' allegations as true for the sake of argument, they have failed to state a claim against Duke Energy. The Second Amended Complaint does not allege the management, business purpose, operation, equipment, customers, supervision and ownership of Duke Energy is substantially identical to that of Piedmont. Rather, the only allegations touching on the relevant factors are that Piedmont Gas does not operate separately from Duke Energy, (2nd Am. Compl. at ¶ 37), Piedmont Gas is wholly owned by Duke Energy, (*Id.* at ¶ 39), and Piedmont Gas shares the same corporate governance as Duke Energy, (*Id.* at ¶ 40).

At best, Plaintiffs have alleged that the management, operation, and ownership of Duke Energy and Piedmont overlap. Following the acquisition, Piedmont became wholly owned by Duke Energy. However, "[c]ontrol through the ownership of shares does not fuse the corporations, even when the directors are common to each." *Bestfoods*, 524 U.S. at 61. Similarly, Thomas E. Skains (Piedmont's then-Chairman, President, and CEO) was added to Duke Energy's Board of Directors following the acquisition, but "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *Id.*

Plaintiffs fail to allege the business, purpose, equipment, customers, and supervision of Duke Energy and Piedmont are substantially identical. Nor could Plaintiffs so allege, even if they tried. Duke Energy and Piedmont operate different equipment in different states. The extensive energy refinement, power plant, and gas pipeline systems run by each corporation are part of separate networks. Duke Energy does not employ Piedmont's employees. Duke Energy does not

4816-7605-2144.2

serve Piedmont's customers. The integration of corporate functions such as accounting, human resources and information technology, (2nd Am. Compl. at ¶ 43), pension and savings plan benefits (*Id.* at ¶ 46), and website features (*Id.* at ¶ 49-52) does not affect the parent-subsidiary relationship in any way.

The CBAs Plaintiffs allege were breached confirm that the signatory employer (both pre and post-acquisition) is Piedmont Gas, *not* Duke Energy. The mere fact that corporate parent Duke Energy owns its subsidiary Piedmont does not make Duke Energy the alter ego of Piedmont, and does not make Duke Energy a proper party to this lawsuit. Count IV of the Second Amended Complaint (For Liability on Behalf of Defendant Duke Energy Under Veil-Piercing/Alter Ego Theory) should accordingly be dismissed.

## C. The Union did not exhaust its internal contractual remedies as required prior to asserting a § 301 claim in this Court.

When a CBA sets forth a grievance procedure, that is the exclusive and final remedy for disputes arising under that agreement. *Sims v. Boeing Co*., 60 F. Supp. 2d 1220, 1228 (D. Kan. 1999) (citing *Vaca v. Sipes*, 386 U.S. 171, 184 (1967)). "[I]t is the arbitrator, not the court, who has the responsibility to interpret the labor contract at first instance." *Allis-Chambers Corp. v. Lueck*, 471 U.S. 202, 220 (1985).

As this Court has recently stated, "[t]here is a strong federal policy in favor of the finality of arbitration in resolving labor disputes by grievance procedures adopted by the parties." *Gipson Mechanical Contractors, Inc. v. U.A. Local 572 of the United Association of the Journeyman and Apprentices of the Plumbing and Pipefitters Industry of the United States and Canada (AFL-CIO)*, 362 F. Supp. 3d 451, 460 (M.D. Tenn. 2019) (Trauger, J.) (citing *Malone v. U.S. Postal Serv.*, 526 F.2d 1099, 1104 (6th Cir. 1975)). Accordingly, "where the contract provides grievance and

arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute." *Id.* (internal quotations omitted).

In *Gipson*, the same Union that brings this action (albeit a different local) advocated for dismissal of an employer's breach of contract claim against it, arguing to the Court that "a claim under Section 301 will lie only when a plaintiff 'has first exhausted the exclusive grievance and arbitration procedures provided in the collective bargaining agreement.'" Memo. in Support of Motion to Dismiss, Doc. No. 12, 3:18-cv-00768 (Sept. 27, 2018).

The Union's arguments for dismissal of a claim against it in *Gipson* dictate dismissal of its breach of contract claim here. The 2018 CBA contains a dispute resolution provision at Article XII, requiring the parties to proceed through their agreed multi-step process in order to resolve the dispute "in the simplest and most direct manner" possible. (*See* 2018 CBA, Ex. 4 Art. XII at 13). Furthermore, Article XII provides that, if the Union "fails to submit the grievance in writing … [or fails] to appeal to the next step of the procedure within the time limit provided, the grievance shall be deemed not to exist and no action shall be taken by either party." (*Id.* at 15). The Union's agreement to this contractual dispute resolution procedure bars its attempt to side-step that procedure here and first raise its dispute in federal court instead.

Plaintiff's assertion that "it would have been futile for Local 702, the Named Participants, or putative Class members to obtain relief through the grievance procedure or exhaust their administrative remedies" is unsupported by any factual allegations whatsoever. (2nd Am. Compl. ¶ 94). Plaintiffs simply failed to follow the mandatory grievance procedure in the CBA. They cannot circumvent this obligation without "a clear and positive showing of futility," and no such

clear and positive showing has been made. *Miller v. Chrysler Corporation*, 748 F.2d 323, 326 (6th Cir. 1984).

Similarly, the Individual Plaintiffs cannot avoid the grievance process in the CBA by characterizing their claims as "class claims." It is well settled that the unavailability of classwide arbitration procedures is not a basis to invalidate an agreement to arbitrate. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2010). The Individual Plaintiffs are contractually obligated to grieve their claims, and should not be permitted to "end run" the mandatory grievance process.

**D.      Any ERISA claims arising out of the collective bargaining agreement were subject to the grievance procedure in the CBA as well.**

As discussed below, the Individual Plaintiffs' ERISA claim fails as a matter of law. The Court, however, should dismiss their ERISA claim prior to reaching the merits because that claim, like the Union's breach of contract claim, is subject to a mandatory contractual dispute resolution process in which the Individual Plaintiffs have not engaged.

In a case involving LMRA and ERISA claims over collectively bargained retiree medical benefits, the Sixth Circuit made clear that ERISA claims arising out of a collective bargaining agreement can be subject to the collective bargaining agreement's arbitration provision, even where the arbitration provision does not specifically reference ERISA claims. *Van Pamel v. TRW Vehicle Safety Sys., Inc.*, 723 F.3d 664, 669 (6th Cir. 2013). This principle is a departure from the general rule that federal statutory claims are not subject to mandatory arbitration unless specifically listed in the arbitration provision. *Id.* The Sixth Circuit explained the common-sense logic for this rule:

ERISA claims are distinguishable from ADEA claims because ERISA claims are derived, at least in part, on the rights a plaintiff may have under a collective bargaining agreement. In other words, if Plaintiffs' contractual claim fails because the CBA does not create a vested right to healthcare benefits, their ERISA claims must fail as well. … Thus ERISA claims can be the subject of arbitration pursuant to a CBA, even without an express listing of "ERISA claims" in the arbitration provision, because the genesis of the claim is the agreement, not the statute.

*Id.* at 669-70.

Here, like in *Van Pamel*, the Individual Plaintiffs' purported ERISA claim derives from the CBA. Indeed what the Individual Plaintiffs call the "Plan" and "governing Plan documents" are in reality a single provision from successive CBAs. (*See* 2nd Am. Compl. at ¶ 19). Those provisions do not exist separately from those CBAs and the mandatory dispute resolution procedures included therein. The Individual Plaintiffs' ERISA claim should accordingly be dismissed on this basis as well.

## E.     The sick leave provision in the parties' prior CBAs was a payroll practice, not an ERISA plan.

The Individual Plaintiffs' ERISA claim fails as well because the benefit at issue -- paid sick leave -- is not, and was never, subject to ERISA.

In the Sixth Circuit, courts apply the following three-part test to determine whether a plan or practice is governed by ERISA:

(1) first, does a "safe harbor" exception apply;

(2) if not, do "the surrounding circumstances" suggest that "a reasonable person could ascertain the intended benefits, the class of beneficiaries, the source of financing, and the procedures for receiving benefits"; and

(3) has "the employer established or maintained the plan with the intent of providing benefits to its employees."

*Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 479 (6th Cir. 2007). The safe harbor provisions

are found in the Department of Labor's ERISA regulations. Applicable here is the safe harbor for

"payroll practices," which states in pertinent part:

> For purposes of [ERISA], the terms "employee welfare benefit plan" and "welfare
> plan" shall not include -
> …
> (2) Payment of an employee's normal compensation, out of the employer's general
> assets, on account of periods of time during which the employee is physically or
> mentally unable to perform his or her duties, or is otherwise absent for medical
> reasons (such as pregnancy, a physical examination or psychiatric treatment) ….

29 U.S.C. § 2510.3-1(b)(2). If a particular benefit meets the definition of a payroll practice, it is

exempt from ERISA and the analysis ends at the first step. *See Langley*, 502 at 479-80 (holding

that an employer's disability absence plan was a payroll practice and not an ERISA-governed

welfare plan because the benefit was paid out of the company's general assets and recipients

received only "normal" compensation).[6]

Here, the sick leave benefits provided in the CBA fall squarely within the definition of a

payroll practice exempt from ERISA. Article X of the 1989 CBA confirms that the provision

provides continuation of employee wages: "pay will be computed at straight time rates for the

employee's regularly scheduled days of work." (1989 CBA, 2nd Am. Compl. Ex. A, Art. CVII at

23). And neither Article X nor any other provision in the 1989 CBA (or any subsequent CBA)

creates a trust or funding source other than Piedmont Gas's general assets through its customary

payroll practices. These indisputable facts, all of which are confirmed in the Second Amended

---

[6] The analysis in *Langley* was complicated by the fact that the governing documents referenced ERISA, the fact that
the employer's disability absence plan was a payroll practice notwithstanding. *See Langley*, 502 F.3d at 479-481.
Those more complicated facts, which did not change the result regardless, are not present here. None of relevant
collective bargaining agreements make any suggestion that sick leave was governed by ERISA, nor have Plaintiffs
presented any other document suggesting anyone ever thought sick leave benefits might be governed by ERISA.

4816-7605-2144.2

Complaint and the CBAs referenced therein, dictate dismissal of the Individual Plaintiff's ERISA claim.

**F.    Even if ERISA governed the sick leave provision of the parties' prior CBA, the Individual Plaintiffs' ERISA claim would still fail because those sick leave "benefits" were not vested.**

Assuming the Individual Plaintiffs could clear the two prior hurdles to their ERISA claim, that claim still fails because the "benefit" they claim Piedmont Gas took away was not a vested benefit and could be modified or terminated without violating ERISA.

As the United States Supreme Court has noted, "ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits." *Curtiss-Wright Corp. v. Schoonejogen*, 514 U.S. 73, 78 (1995). An employer can accordingly amend a plan in a manner that deprives participants of welfare benefits they previously received, "for any reason at any time," without violating ERISA. *Id.* In the context of collectively bargained benefits, this means that welfare benefits in a CBA do not survive the expiration of the CBA that provides them (by virtue of the application of the CBA's durational clause). There is a limited exception to this general rule in the context of collectively bargained retiree welfare benefits. In the Sixth Circuit, the rule in this regard is clear, "A CBA's general durational clause applies to healthcare benefits unless [the CBA] contains clear, affirmative language indicating the contrary." *Zino v. Whirlpool Corp.,* 763 Fed. Appx. 470, 472 (6th Cir. Feb. 15, 2019) (quoting *Fletcher v. Honeywell Int'l, Inc.*, 892 F.3d 217, 228 (6th Cir. 2018)).

Here, the various CBAs the Individual Plaintiffs reference do not contain "clear, affirmative language" indicating that the sick leave benefits were intended to vest or otherwise survive the expiration of the applicable CBAs.

4816-7605-2144.2

21

**G.      The Individual Plaintiffs' age discrimination claim is preempted by the LMRA.**

The Individual Plaintiffs' final claim of age discrimination under the Tennessee Human Rights Act ("THRA") arises solely out of the Union's and Piedmont Gas's collective bargaining efforts.  This legal theory is inextricably intertwined with the parties' CBAs and their collective bargaining efforts generally.  The LMRA preempts state law discrimination claims like this.

"When resolution of a state law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor contract law." *Bailey v. U.S.F. Holland, Inc.*, No. 3:15-cv-0025, 2015 WL 2125137, *19-20 (M.D. Tenn. May 6, 2015) (Trauger, J.) (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985)).

This Court has set out the test for analyzing § 301 preemption of state law claims:

> First, courts must determine whether resolving the state law claim would require interpretation of the terms of the labor contract.  [*Paul v. Kaiser Foundation Health Plan of Ohio*, 701 F.3d 514, 519 (6th Cir. 2012)].  If so, the claim is preempted. "The preemption question depends on whether the essence of a plaintiff's claim is 'inextricably intertwined' with interpretation of CBA terms or whether it is only 'tangentially related' to the CBA." *Powers v. Cottrell*, 728 F.3d 509, 516 (6th Cir. 2013) (quoting *Paul*, 701 F.3d at 522).  Second, courts must ascertain whether the rights claimed by the plaintiff were created by the labor contract, or instead by state law.  *Id.* If the rights were created by the labor contract, the claim is preempted.  *Id.* If a state law claim fails *either* of these two requirements, it is preempted by § 301. *Id.*  On the other hand, "[i]f the right both is borne of state law and does not invoke contract interpretation, then there is no preemption." [*DeCoe v. GMC*, 32 F.3d 212, 216 (6th Cir. 1994)].

*Bailey*, 2015 WL 2125137 at *21.

The Sixth Circuit has repeatedly analyzed the interrelationship between a particular discrimination claim and an applicable CBA, and those prior decisions provide helpful guidance in determining which discrimination claims are sufficiently independent of a CBA to survive § 301 preemption and which are not.

4816-7605-2144.2

22

Where a plaintiff's theory of discrimination challenges an action taken by his or her employer that can be analyzed without interpreting an applicable CBA, the claim is not preempted by § 301, even if the employer refers to the CBA in asserting its defense. *See O'Shea v. Detroit News*, 887 F.2d 683, 687 (6th Cir. 1989); *Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1334 (6th Cir. 1989). Conversely, where a plaintiff's discrimination theory is "substantially dependent on analysis of a collective bargaining agreement, [it is] completely preempted by § 301 of the LMRA." *Paluda v. ThyssenKrupp Budd Co.*, 303 Fed. Appx. 305, 309 (6th Cir. 2008); *see also Slinker v. Jim Beam Brands Co.*, 689 Fed. Appx. 406, 409 (6th Cir. 2017); *Diehl v. Int'l Truck & Engine Corp.*, 132 Fed. Appx. 590, 593 (6th Cir. 2005).

The Sixth Circuit's opinion in *Slinker* is instructive. In that case, a Jim Beam employee alleged that Jim Beam discriminated against him based on his age in violation of the Kentucky Civil Rights Act after it fired him for failing a drug test that was not administered as required by the relevant CBA. *Slinker*, 689 Fed. Appx. at 407. The Sixth Circuit affirmed the district court's application of § 301 preemption, reasoning:

> As the district court properly concluded, plaintiff's age discrimination claim plainly falls within the first prong. Slinker's complaint amply suggests interpretation of the union contract's drug-testing article is required to adjudicate his claim under Kentucky law—he complains that Jim Beam drug tested him in a manner that "violat[ed] . . . the policy and procedures outlined in the Collective Bargaining Agreement," while at the same time Jim Beam delayed a drug test for a younger co-worker also "in violation of the collective bargaining agreement . . . ." Determining whether Jim Beam complied with the union contract when it drug tested plaintiff and his co-worker necessarily requires interpreting the drug-testing provision of the contract. Because "plaintiff can[not] prove all of the elements of his claim without the necessity of contract interpretation"—i.e., whether Jim Beam treated an alleged comparator differently—*Section* 301 preempts his claim, and therefore there is no miscarriage of justice. *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994); *Paluda v. ThyssenKrupp Budd Co.*, 303 F. App'x 305, 308-09 (6th Cir. 2008).

689 Fed. Appx. at 408-09.

Here, the Individual Plaintiffs' age discrimination claim necessarily, and unavoidably, requires interpretation of the parties' CBAs, and the Individual Plaintiffs' pleadings confirm it. In pleading their THRA claim, the Individual Plaintiffs allege, as a basis for their claim, that they "earned and were entitled to the benefits provided them pursuant to the Plan." (2nd Am. Compl. at ¶ 81). That allegation cannot be evaluated without interpreting what the Individual Plaintiffs call "the Plan" but what is in reality a provision of the CBA. (*Id.* at ¶ 19).

The Individual Plaintiffs attempt to minimize the Union's role in setting the terms and conditions of employment for bargaining unit employees through collective bargaining, going as far as alleging, without any reference to the Union, that Piedmont Gas "controlled the terms of employment for Named Participants and the Class members during the relevant period, including employee benefits." (*Id.* at ¶ 79). That allegation cannot be squared with principles of collective bargaining and the Union's CBA with Piedmont Gas, including contractual provisions addressing, Benefit Plans (Article XIII), Vacation (Article XIV), Holidays (Article XV), Sick Leave (Article XVI), and Parental Leave (Article XVII), all of which are, broadly considered, employee benefits. But regardless, the 2012 CBA references carried-over sick leave and the 2018 CBA does not. This change in the terms of successive CBAs is the crux of Plaintiffs' claims, and the circumstances under which a particular benefit was previously referenced in a CBA, and now is not, *per se* cannot be evaluated without interpreting the relevant CBAs.

The application of § 301 preemption here is consistent with federal labor law policy. If the Union believed the removal of continued carry-over of banked sick leave was unfair--or as the Individual Plaintiffs now allege, discriminatory--it should have addressed it during negotiations. It did not, and instead agreed to the 2018 CBA. Permitting the Individual Plaintiffs to attack a CBA with a discrimination theory while giving their Union a "free pass" would incentivize labor

unions to agree to contract terms that some constituencies prefer and then collaterally attack the very CBA they just ratified on behalf of other constituencies.[7] That result would be anathema to orderly labor relations and federal labor law.

## IV. Conclusion

If the Union and the Individual Plaintiffs have a labor dispute they believe should be addressed, they must do so with Piedmont Gas -- not Duke Energy -- and through the contractual dispute resolution process to which they agreed. Sixth Circuit law does not permit them to unilaterally side-step that agreed process in favor of a federal court action. Their claims should accordingly be dismissed.

*s/ Paul S. Davidson*
Paul S. Davidson (TN BPR# 011789)
John E. B. Gerth (TN BPR# 024439)
WALLER LANSDEN DORTCH & DAVIS, LLP
The Nashville City Center
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Phone: 615-244-6380
Email: paul.davidson@wallerlaw.com
Email: jeb.gerth@wallerlaw.com

*Counsel for Defendants Piedmont Natural Gas Company, Inc. and Duke Energy Corporation*

---

[7] If the Individual Plaintiffs believe Piedmont Gas violated their contractual rights regarding accrued sick leave and the Union did not appropriately address it, they have a remedy in the form of a § 301 hybrid claim against Piedmont Gas for breach of contract and the Union for failure to represent them.

4816-7605-2144.2

25

## **Certificate of Service**

I certify that a true and correct copy of the foregoing was served *via* the Court's CM/ECF system upon:

Joe P. Leniski, Jr.
Karla M. Campbell
BRANSTETTER STRANCH & JENNINGS, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203

on January 13, 2020.

*/s/ Paul S. Davidson*
Paul S. Davidson