## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| **DARRELL PRIDY** *et al.*,       )<br>      )<br>    **Plaintiffs,**      )<br>      )<br>**v.**      )<br>      )<br>**PIEDMONT NATURAL GAS**      )<br>**COMPANY, INC.,**      )<br>      )<br>    **And**      )<br>      )<br>**DUKE ENERGY CORPORATION, as the**  )<br>**alter ego or successor in liability to**  )<br>**PIEDMONT NATURAL GAS**      )<br>**COMPANY, INC.,**      )<br>      )<br>    **Defendants.**      ) | **Case No. 3:19-cv-00468**<br>**Judge Aleta A. Trauger** |

## MEMORANDUM

Following dismissal of the First Amended Complaint, plaintiffs Local Union 702 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industries (the "Union") and Union members Darrell Pridy, Gregory Nabors, Michael Sanders, and Randall Abston (the "individual plaintiffs"), on behalf of themselves and other similarly situated ("class members"), sought and were granted leave to file their Second Amended Complaint (Doc. No. 26). In it, they bring suit against Piedmont Natural Gas Company, Inc. ("Piedmont Gas" or "Piedmont") and Duke Energy Corporation ("Duke Energy") under Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a); the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-12-401; and Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Now before the court is the defendants' joint Motion to Dismiss the Second Amended Complaint. (Doc. No. 29.)

For the reasons set forth herein, the motion will be granted.

## I.      FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

The First Amended Complaint named only Duke Energy as a defendant. The court granted Duke Energy's Motion to Dismiss the First Amended Complaint on the grounds that it failed to state a claim against Duke Energy directly and failed to allege facts that, if true, would establish that Duke Energy was the legal successor to Piedmont Gas or its alter ego. (Doc. Nos. 20, 21.)

Following dismissal of the First Amended Complaint without prejudice and with leave to amend, the plaintiffs filed their Second Amended Complaint ("SAC") on December 23, 2019, naming both Duke Energy and Piedmont Gas as defendants. (Doc. No. 26.) The factual allegations set forth in the SAC in support of the plaintiffs' substantive claims are essentially identical to those set forth in the First Amended Complaint. The SAC, however, adds new allegations differentiating between Piedmont Gas and Duke Energy and attempting to support the plaintiffs' claim that Duke Energy is liable for the wrongful acts of Piedmont Gas on the grounds that it is either Piedmont Gas's successor in interest or its alter ego. (Doc. No. 26 ¶¶ 6, 7, 10, 11, 17, 37–53.) And the SAC adds two new "Counts" or claims for relief: one "For Liability on Behalf of Defendant Duke Energy Under Veil-Piercing/Alter Ego Theory" (*id.* at Count VI and ¶¶ 96–100), and the second "For Liability on Behalf of Duke Energy as Successor In Interest to Defendant Piedmont Gas" (*id.* at Count V and ¶¶ 101–03).

Otherwise, like the First Amended Complaint, the SAC alleges that the individual plaintiffs are all over the age of forty, have all been employed by Piedmont Gas for many years, and have "participated in various employee benefit plans, including a welfare benefit plan for

Company[1] employees providing sick leave and short-term disability benefits." (Doc. No. 26 ¶¶ 1–4.) During their employment, the individual plaintiffs were continuously members of the Union and represented by it in collective bargaining. (*Id.* ¶ 16.) The plaintiffs claim that, "[a]t all times during [the individual plaintiffs'] employment, [Piedmont Gas] was and continues to be a party to the collective bargaining agreement with [the Union]." (*Id.* ¶ 17.) It asserts that Duke Energy "is also a party to the collective bargaining agreements with [the Union] on the basis that it is an alter ego and/or successor in liability to Piedmont Gas." (*Id.*)

The collective bargaining agreement ("CBA") in effect from 1989 to 1992 ("1989 CBA") between Piedmont Gas and the Union "established a sick leave and short-term disability benefit plan ('Plan')" governed by Section X of that document. (*Id.* ¶ 19.) According to the plaintiffs, Section X of the 1989 CBA "and successive collective bargaining agreements are the governing Plan documents." (*Id.*)

The 1989 CBA's Plan allowed participants to accrue sick leave days and to "bank" the accumulated days. (*Id.* ¶ 20.) The 1989 CBA refers to the accrued sick leave account as a "sickness allowance" (*id.*), while subsequent CBAs refer to individual accrued sick leave accounts as "Leave Bank[s]." (*Id.* ¶ 21.) Nomenclature aside, the benefit plans described in subsequent CBAs in effect over the ensuing decade continued to adopt a similar sickness allowance policy, permitting the accrual of hours of unused sick leave and the banking of such time. The CBA adopted in 1999 and in effect until 2004 (the "1999 CBA") was the last CBA to allow the unlimited accrual of sick leave hours. (*Id.*) The sickness allowance effectively rewarded individuals who did not take frequent sick leave by allowing them to continue to accrue an unused allotment by carrying over those hours from year to year. (*Id.* ¶ 25.)

The CBA that went into effect on December 31, 2004 ("2004 CBA"), eliminated the

---

[1] The term "Company" is defined in the SAC to mean Piedmont Gas. (Doc. No. 26, at 2.)

accumulation of hours in "Leave Banks" going forward, but it allowed participants with hours already accrued in their Leave Banks to carry over and use that time as described in the 2004 CBA. (*Id.* ¶ 26.) The Sick Leave provision in the 2004 CBA provided, in relevant part:

> Employees are credited with 12 days of sick leave each January 1 to be taken as needed for any period of illness during the calendar year. They may also use any accrued sick days in their Leave Bank (sick leave earned before January 1, 2005) when all of their annual sick days have been used or for a certified FMLA Leave to care for an immediate family member. Banked days may also be used to cover the waiting period before short-term disability benefits begin.

(I*d.* ¶ 27.) According to the plaintiffs, the CBAs in effect from August 2008 through August 2012 ("2008 CBA") and from August 2012 through August 2018 ("2012 CBA") similarly recognized employees' ability to use Leave Bank time accrued prior to January 2005. (*Id.* ¶ 28.)

The current CBA ("2018 CBA") went into effect on April 14, 2018. (Doc. No. 30-4.) The 2018 CBA is silent regarding Leave Banks and leave hours accrued prior to 2005. (*See generally id.*) However, in April 2018, Piedmont Gas eliminated an online portal that had allowed employees to access their Leave Banks, and it began refusing to honor the accrued time in employees' Leave Banks. The plaintiffs claim that Piedmont Gas provided no prior notice of this action. All of the individual plaintiffs and class members had accrued sick leave hours in their Leave Banks. At least one of the individual plaintiffs requested to use accrued leave time in late April 2018 but was informed by his supervisor that "the Company no longer allowed employees to use those benefits." (Doc. No. 26 ¶¶ 30–32.)

The plaintiffs allege that, during negotiations leading up to execution of the 2018 CBA, the "Company (represented by officials with both Piedmont Gas and Duke Energy)" and the Union did not bargain over sick leave and short-term disability benefits that were owed under prior CBAs. (*Id.* ¶ 33.) "[I]nstead, the Company unilaterally informed [the Union] that it would no longer honor accrued Leave Bank benefits in the new collective bargaining agreement, and

unilaterally chose to deny accrued Leave Bank benefits" to the individual plaintiffs and the other 60 class members. (*Id.*; *see also id.* ¶ 35.)

Based on these allegations, the plaintiffs claim that Piedmont Gas violated ERISA by wrongfully denying accrued and nonforfeitable rights to banked sick and disability leave benefits; discriminated against them on the basis of age, in violation of the THRA; and violated the LMRA by breaching binding CBAs. It asserts that Duke Energy should be held "jointly and severally liable with Piedmont Gas" because it is the "alter ego" of Piedmont Gas (*id.* ¶ 100) or is its "successor in interest to the applicable collective bargaining agreements" (*id.* ¶ 103).

The defendants now move for dismissal of the SAC on the grounds that (1) Duke Energy is not a proper party; (2) the claims brought by both the Union and the individual plaintiffs have not been exhausted "through the proper grievance and arbitration procedure" provided by the operative CBA; (3) the individual plaintiffs' ERISA claim fails because "the program at issue was a 'payroll practice,' not an ERISA-governed welfare plan, and in any event the 'benefits' were not vested"; and (4) the individual plaintiffs' age discrimination claim under the THRA is preempted by Section 301 of the LMRA. (Doc. No. 29, at 2; *see generally* Doc. No. 30.)

In their Response, the plaintiffs argue that the defendants' Motion to Dismiss is improper under Rule 12(b)(6), as it asks the court to "make inferences about matters not contained in the [SAC] and to resolve disputes of fact." (Doc. No. 33, at 4.[2]) More specifically, they contend that (1) the new allegations in the SAC are sufficient to establish that Duke Energy is a proper defendant in this action as either a legal successor to, or alter ego of, Piedmont Gas; (2) they should be excused from exhausting the contractual grievance procedure as it relates to their

---

[2] The plaintiffs did not consider the case caption page to be the first page of their Response, as a result of which their pagination and that assigned by CM/ECF is inconsistent. The court will use the CM/ECF pagination when referring to the plaintiffs' Response.

ERISA and LMRA claims on the grounds of futility; (3) whether the program at issue was a "payroll practice" rather than an ERISA-governed welfare plan raises issues of fact that cannot be resolved in the context of a motion to dismiss, and, alternatively, if the court determines as a matter of law that the program is a payroll practice, the plaintiffs should be permitted to amend their pleading to assert a claim under Tennessee law, Tenn. Code Ann. § 50-2-103; and (4) the THRA claim is not preempted, because it is not "substantially dependent" on the terms of any CBA.

The defendants have filed a Reply Brief, in which they ask the court to take judicial notice of public filings with the Securities and Exchange Commission to find that Duke Energy is the corporate parent, rather than a successor entity or alter ego, to Piedmont Gas. (Doc. No. 36, at 2.) They also maintain that the plaintiffs have not offered a viable excuse for their failure to exhaust contractual remedies; amendment of the pleading would be futile because a state-law claim under Tenn. Code Ann. § 50-2-1-3 would be preempted by the LMRA; and the THRA claim is likewise preempted.

## II.    STANDARD OF REVIEW

For purposes of a motion to dismiss under Rule 12(b)(6), the court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an

entitlement to relief. *Id.* at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.* at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010).

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). However, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. Fed. R. Civ. P. 10(c); *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007); *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999). The court may also "consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice." *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003).

The defendants filed with their Motion copies of the 2004, 2008, 2012, and 2018 CBAs. (Doc. Nos. 30-1, 30-2, 30-3, 30-4.) Because these documents are referenced in the SAC and are integral to the plaintiffs' claims, the court may consider them without converting the defendants' motion into one for summary judgment.

The court, however, declines to consider the SEC document attached to the defendants' Reply. (Doc. No. 36-1.) Although it is generally recognized that courts may take judicial notice of public disclosure documents filed with the SEC, *see Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001), judicial notice of a public record is only appropriate if its "existence or contents prove facts whose accuracy cannot reasonably be questioned." *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005). The SEC document filed with the

defendants' Reply is a Proxy Statement and a Merger Proposal announcing a shareholder meeting for the purpose of approving a proposed merger agreement pursuant to which Piedmont Gas would become a wholly-owned direct subsidiary of Duke Energy. It does not establish as a factual matter that the merger actually took place or that its terms were consistent with those set forth in the proposal.

## III. DISCUSSION

### A. Whether Duke Energy Is Properly Named as a Party

#### 1. Successor Liability

In addressing this issue in the context of ruling on Duke Energy's Motion to Dismiss the First Amended Complaint, this court stated:

> As courts within this circuit and elsewhere have recognized, [s]uccessor liability enables claimants to seek recourse from the successor that has replaced or entirely taken over the original entity. On the other hand, if the original entity has not gone anywhere, there is no successor—and no successor liability.

*Pridy v. Duke Energy Corp.*, No. 3:19-cv-00468, 2019 WL 6329659 (M.D. Tenn. Nov. 26, 2019) (Trauger, J.) (citations and internal quotation marks omitted).

For the same reasons as those set forth in the referenced opinion, the court finds that the allegations in the SAC still fail to establish successor liability in this case. According to the plaintiffs' allegations, Piedmont Gas has maintained its corporate form, remains a legal entity, is still the plaintiffs' employer (or former employer, with respect to those class members who have already retired), and is the signatory to the CBAs referenced in the SAC. In other words, even if the court draws all reasonable inferences in the plaintiffs' favor, the allegations in the SAC make it clear that Piedmont Gas has not "gone anywhere," and the court stands by its prior analysis to find that the allegations in the SAC do not establish "successor liability" on the part of Duke Energy.

2.      Alter Ego Liability

Regarding Count I of the SAC, asserting a claim under 29 U.S.C. § 1132, the Sixth Circuit recently acknowledged that it has never actually decided which alter ego test applies to an ERISA claim brought by a labor union—whether the "the alter-ego test of the National Labor Relations Act of 1935 ("NLRA"), 29 U.S.C. § 151 *et seq.*," or the more stringent "corporate law alter-ego test." *Trustees of Operating Eng'rs Local 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 374 (6th Cir. 2019), *reh'g denied* (June 20, 2019); *see Rd. Sprinkler Fitters Local Union No. 669, U.A., AFL-CIO v. Dorn Sprinkler Co.*, 669 F.3d 790, 794 (6th Cir. 2012) (noting that the NLRA test "has been described as a 'more relaxed, less exacting' application of the alter-ego doctrine"); *Greater Kan. City Laborers Pension Fund v. Superior Gen. Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997) (distinguishing between the tests and applying common law test in ERISA case). Because the defendant in *Bourdow* affirmatively argued in the district court that the former applied to the ERISA claim in that case, the Sixth Circuit declined to review that issue on appeal. Here, too, both parties have presumed that the "more relaxed" NLRA test may apply in a labor case raising an ERISA claim, so the court does as well. However, as set forth below, the court also finds that other criteria for applying this test are not met in this case.

a)  The NLRA Alter Ego Test

The Sixth Circuit has long recognized the alter-ego doctrine in the labor context as "an equitable doctrine that prevents employers from evading their obligations under a CBA by changing or altering their corporate form." *Trs. of Detroit Carpenters Fringe Benefit Funds v. Patrie Constr. Co.*, 618 F. App'x 246, 252 (6th Cir. 2015) (citations and internal quotation marks omitted). When applied, the doctrine has the effect of "bind[ing] an employer to a collective bargaining agreement if it is found to be an alter ego of a signatory employer." *Trs. of Detroit*

*Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC*, 581 F.3d 313, 318 (6th Cir. 2009).

The Sixth Circuit, however, has applied it in only two types of situations:

> (1) where a "new entity begins operations but is merely a disguised continuance of the old employer"; and (2) in "double-breasted operations," *i.e.*, "where two or more coexisting employers performing the same work are in fact one business, separated only in form."

*Patrie Constr. Co.*, 618 F. App'x at 252 (quoting *Indus. Contracting*, 581 F.3d at 318). In a "disguised continuance" case, "a new employer that continues the operations of an old employer" will be bound by the old employer's obligations under a collective bargaining agreement "in those cases where the new employer is merely a disguised continuance of the old employer." *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir. 1990) (citations and internal quotation marks omitted). And the term "double-breasted operations" refers to "two or more coexisting employers performing the same work [that] are in fact one business, separated only in form." *Id.*; *see, e.g.*, *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 582–83 (6th Cir. 1986) (finding that a new corporation formed by the split of an employer's moving and storage business into two entities was the alter ego of the employer and, therefore, bound by its collective bargaining obligations).

Assuming a case follows one of these two models, "[t]he test for determining whether two companies are alter egos is 'whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership.'" *Patrie Constr. Co.*, 618 F. App'x at 252 (quoting *Indus. Contracting*, 581 F.3d at 318). However, if a case "involves neither a disguised continuance situation nor a double-breasted operation . . . , the alter ego doctrine is inapplicable." *Int'l Union, UAW v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005). More specifically, the "more relaxed" NLRA version of the alter ego doctrine is inapplicable. *See id.* (considering whether traditional veil-piercing standard applies instead).

*b) The NLRA Alter Ego Test Is Not Applicable*

As set forth above, Duke Energy is not Piedmont Gas's successor. For essentially the same reasons, it is also not a "disguised continuance" of Piedmont Gas, given that Piedmont Gas remains in existence and is still the individual plaintiffs' employer. Nor are the two companies alleged to be engaged in a "double breasted operation," plaintiffs' assertions to the contrary notwithstanding. Instead, as allegations in the SAC make clear, Piedmont Gas is Duke Energy's wholly owned subsidiary. (SAC ¶¶ 38, 39.) Accordingly, the relaxed NLRA alter ego test does not apply to the plaintiffs' ERISA claim. *Accord Aguirre*, 410 F.3d at 302.

In *Aguirre*, the Sixth Circuit rejected the plaintiffs' argument for applying a "veil piercing version of the alter ego doctrine," noting that "[v]eil piercing and alter ego concepts are separate and distinct." *Aguirre*, 410 F.3d at 302. A demand to pierce the corporate veil "ask[s] a court to hold A vicariously liable for B's debt." *Id.* (citation omitted). "By contrast, a contention that A is B's 'alter ego' asserts that A and B are *the same entity*; liability then is not vicarious but direct." *Id.* at 302 (citation omitted). Because that case arose in the labor context but involved "neither a disguised continuance situation nor a double-breasted operation," the court held that the NLRA alter ego doctrine did not apply. It nonetheless moved on to consider whether veil-piercing applied under the facts as presented there:

> We have held that the corporate veil may be pierced if the court finds "substantial reasons for doing so" after considering three general factors: (1) the amount of respect given to the separate identity of the corporation by its shareholders; (2) the degree of injustice visited on the litigants by recognition of the corporate entity[;] and (3) the fraudulent intent of the incorporators. In analyzing these three general factors, courts frequently consider more specific factors such as undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham.

*Id.* (internal quotation marks and citations omitted); *see also Fullerton Transfer*, 910 F.2d at

336–37 (where the plaintiffs failed to show that the relationship between the defendants fell into either the "disguised continuance" or "double breasted operations" category, holding that application of the "relaxed alter ego standard" was not appropriate and, instead, that the plaintiffs "must rely on more traditional alter ego principles").[3] Based on this authority, the court finds that traditional veil-piercing standards apply to the plaintiffs' claims.[4]

Moreover, *even if* the "relaxed" alter ego doctrine applied, the plaintiffs have not alleged facts showing that Duke Energy and Piedmont Gas have "substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." *Indus. Contracting*, 581 F.3d at 318. Regarding management, the SAC states: "[Piedmont Gas] shares the same corporate governance as Duke Energy. Following the closing of the merger, Duke Energy added Piedmont's then-current Chairman, President, and Chief Executive Officer, Thomas E. Skains, to the Duke Energy Board of Directors." (Doc. No. 26 ¶ 40.) The fact that Piedmont Gas's then Chairman, President, and CEO was added to Duke Energy's Board, standing alone, does not suggest substantial overlap in the identity of the corporate management of the two companies. The SAC also alleges that Duke Energy has "integrated Piedmont's corporate functions—such as accounting, human resources and information technology—into its

---

[3] The *Aguirre* parties' failure to distinguish between alter ego liability and piercing the corporate veil is unsurprising given that the courts, including the Sixth Circuit, frequently blur the distinctions between them. *See, e.g.*, *Laborers' Pension Tr. Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 704 (6th Cir. 1988) (using the terms "alter ego liability" and "piercing the corporate veil" essentially interchangeably); *see also Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 930 (6th Cir. 2020) (identifying the distinction between the two concepts but also recognizing that "[t]he analysis and effects are similar").

[4] As the defendants argue, Tennessee veil-piercing law would govern their THRA claims. *See Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 930 (6th Cir. 2020) (applying Tennessee veil-piercing law to the plaintiffs' state law claims). Neither party argues, however, that there is substantial difference between Tennessee and federal law in this arena. Both, at bottom, require some suggestion that misuse of the corporate form was used "to work a fraud or injustice in contravention of public policy." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 215 (Tenn. 2012) (internal citations and quotation marks omitted).

own operating structure." (*Id.* ¶ 43; *see id.* at 44–46.) However, while the SAC does allege facts showing substantial integration of business operations, it contains no concrete allegations regarding the scope of business of each company, their respective operations, or the extent to which they utilize the same equipment or cater to the same customers. The mere fact that Piedmont Gas is a wholly owned subsidiary of Duke Energy with, as a result, some streamlined business and operational procedures between the two companies, does not *per se* establish that Duke Energy is an alter ego of Piedmont Gas.

The plaintiffs claim that it is of particular importance that Duke Energy was "directly involved as a bargaining party during the negotiations leading to the formation" of the 2018 CBA and that "Duke Energy representatives refused to bargain over sick leave and short-term disability benefits granted and owed under prior CBAs." (Doc. No. 33, at 8 (citing SAC ¶¶ 32, 33).) In fact, the SAC does not allege that Duke Energy was a "bargaining party." Instead, it alleges that, during negotiations, Piedmont Gas ("the Company") was "represented by officials with both Piedmont Gas and Duke Energy." (SAC ¶ 33.) It also asserts that *Piedmont Gas* declined to "honor accrued Leave Bank benefits in the new collective bargaining agreement." (*Id.*) In addition, Piedmont Gas and the Union are the only signatories to the 2018 CBA. The fact that Duke Energy representatives were present during labor negotiations does not establish alter ego status or that Duke Energy should be deemed a party to the 2018 CBA.

More critically, the facts as alleged, accepted as true, do not remotely suggest a misuse of the corporate form in order to "evade preexisting obligations." *See Trs. of Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244, 248 (6th Cir. 2005) (noting that "an intent to evade" preexisting obligations is "clearly the focus of the alter ego doctrine" in the labor context). Of particular relevance here is the fact that the relationship between Duke Energy and Piedmont Gas is not alleged to have any effect on Piedmont Gas's obligations under the

current or previous CBAs. Similarly, for purposes of piercing the corporate veil (or for finding alter ego liability under federal common law, outside the labor context), the plaintiffs have made no showing that any "degree of injustice" or fundamental unfairness might be "visited on the litigants" by recognition of Piedmont Gas as an independent corporate entity or a refusal to pierce the corporate veil between the two companies. *Aguirre*, 410 F.3d at 302.

### 3. Conclusion–Duke Energy's Liability

In sum, the SAC does not allege facts sufficient to support alter ego liability on the part of Duke Energy or that piercing the corporate veil between Piedmont Gas and Duke Energy is warranted. Duke Energy is not a proper defendant in this action, and Counts IV and V of the SAC will be dismissed on that basis.

### B. Exhaustion of the LMRA Claim

The defendants next argue that, because the Union did not exhaust its contractual remedies under the operative CBA, as required prior to asserting a claim under § 301 of the LMRA, 29 U.S.C. § 185, Count III of the SAC must be dismissed. Anticipating the plaintiffs' response, the defendants maintain that futility does not excuse the failure to exhaust contractual remedies, because the plaintiffs have an obligation to make a "clear and positive showing of futility," which they have not done. (*Id.* at 17–18 (quoting *Miller v. Chrysler Corp.*, 748 F.2d 323, 326 (6th Cir. 1984)).)

The failure to exhaust is an affirmative defense. *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012). Generally, a plaintiff is not required to anticipate and plead facts to avoid an affirmative defense. Thus, dismissal on the grounds of an affirmative defense is appropriate only if the operative pleading shows on its face that the claim is barred by the defense. *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010). Courts generally cannot grant motions to dismiss on the basis of an affirmative defense unless

the plaintiff has anticipated the defense and explicitly addressed it in the pleadings. *Pfeil v. State St. Bank & Tr. Co.*, 671 F.3d 585, 599 (6th Cir. 2012), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).

In this case, the plaintiffs expressly acknowledge in the SAC that they did not exhaust administrative remedies, thus anticipating the defense, but they also claim to be excused from compliance with the rule of exhaustion based on futility. (Doc. No. 26 ¶¶ 34, 74, 94.) Likewise, in their Response to the Motion to Dismiss, they argue that pursuit of the contractual procedure would have been both futile and "unduly protracted," essentially because their breach of contract claim is outside the scope of claims covered by the CBA. (Doc. No. 33, at 11.)

1.  The Exhaustion Requirement

The 2018 CBA and the predecessor CBAs from 2004 forward all contain a mandatory grievance procedure, the final step of which is arbitration, to resolve "any disagreement or dispute . . . as to the meaning or interpretation of the terms of this Agreement, or as to the rights of either party hereunder," unless the procedure is "waived by mutual consent." (Doc. No. 30-4, 2018 CBA, Art. XII ¶ 1; *accord* Doc. No. 30-1, 2004 CBA, Art. XIII ¶ 1; Doc. No. 30-2, 2008 CBA, Art. XII ¶ 1; Doc. No. 30-3, 2012 CBA,, Art. XII ¶ 1.) The four-step procedure outlined by the CBAs includes (1) an informal discussion between the aggrieved employee and/or the Union Representative and the employee's immediate supervisor (*see, e.g.*, 2018 CBA Art. XII ¶ 1(a)) and, if that does not resolve the problem, then the Union is to submit the matter in writing to the employee's manager (first step); (2) if the matter is not resolved at the first step, then the Union must "present an appeal in writing . . . to the Managing Director" (*id.* ¶ 1(b)) (second step); (3) the Union may appeal the Managing Director's response to the Managing Director for Human Resources (*id.* ¶ 1(c)) (third step); and (4) if the matter is not resolved at the third step, either party may submit the matter to arbitration (*id.*). The CBAs further provide that, "[i]f the

aggrieved party (Union) fails to submit the grievance in writing . . . or to appeal to the next step of the procedure . . . , the grievance shall be deemed not to exist and no action shall be taken by either party." (*See id.* ¶ 1(d).)

As a rule, in the Sixth Circuit and elsewhere, "[a]n aggrieved employee 'must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress.'" *Miller v. Chrysler Corp.*, 748 F.2d 323, 325 (6th Cir. 1984) (quoting *Republic Steel v. Maddox*, 379 U.S. 650, 652 (1965)). This rule is subject to an exception if the employee demonstrates that it would be "futile" for him to pursue the contractual remedy. *Id.* (citations omitted). A plaintiff, however, must make a "clear and positive showing of futility" before a court will excuse a failure to exhaust on that basis. *Id.* at 326 (citation omitted).

It is not sufficient to show "that a party subjectively thought procedures would be futile." *Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 791 (6th Cir. 2012). In discussing the type of proof necessary to establish futility, the Sixth Circuit has recognized, for example, that an employee who shows that "the grievance procedures had broken down" may circumvent exhaustion. *Bsharah v. Eltra Corp.*, 394 F.2d 502, 502–03 (6th Cir. 1968). In addition, an employee who reasonably relied on his union to file a grievance but the union failed to do so, and the claim would have been time-barred by the collective bargaining agreement by the time the plaintiff became aware of that failure, futility may apply. *Emswiler*, 691 F.3d at 791 (citing *Kaschak v. Consol. Rail Corp.*, 707 F.2d 902 (6th Cir. 1983)). Or when plaintiffs sought arbitration but were "refused that remedy by their union," futility may apply. *Id.* (citing *Nemitz v. Norfolk & W. R.R. Co.*, 436 F.2d 841, 850 (6th Cir. 1971)). However, when the plaintiffs could have pursued a grievance on their own and were not limited by the union's action or failure to act, a finding of futility is not warranted. *Id.* (citing *Atkins v. Louisville & Nashville R.R. Co.*, 819 F.2d 644, 650 (6th Cir. 1987)).

2.     Whether Exhaustion in this Case Would Have Been Futile

In this case, the plaintiffs attempt to show futility by analogizing their situation to that of

the plaintiffs in *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 609 F. Supp. 1299

(E.D. La. 1984). There, the collective bargaining agreement clearly provided that its dispute

resolution procedures applied to disputes "involving an alleged claim of a *particular provision of*

*this Agreement*." *Id.* at 1301 (emphasis in original). The plaintiffs there sought to "bind related

entities of a signatory employer under the alter ego or the single employer theory." *Id.* The

related entities were not actually signatories to the agreement, however, and there was "no clause

present in the agreement allowing claims seeking to bind related entities of a signatory

employer." *Id.* The court concluded that, because "[t]he policy of federal labor law is to restrict

arbitration under the collective bargaining agreement to matters which the parties have agreed

voluntarily to arbitrate," and the non-signatories had not agreed to arbitrate, it logically followed

that "it would have been futile for plaintiffs to pursue the contractual grievance and arbitration

procedures outlined in the collective bargaining agreement." *Id.*[5]

The plaintiffs in this case argue that their situation is similar to that of the plaintiffs in

*Pratt-Farnsworth*, not because they are attempting to sue a non-signatory to the CBA,[6] but

> [b]ecause Defendant refused to honor accrued Leave Bank benefits and would not
> agree to provide for such benefits in what is now the current agreement [the 2018
> CBA],[as a result of which] the current agreement – unlike previous agreements –
> contains no reference, either explicit or implicit, to accrued Leave Bank benefits.
> Under the grievance procedure in the current agreement, disputes and grievances

_____

[5] The opinion contains no further description of the dispute or the relationship between
the parties, as a result of which it has little, if any, persuasive value.

[6] Any claim that exhaustion would have been futile because the plaintiffs were suing a
non-signatory would have been untenable. First, notably, the defendants do not argue that the
question of Duke Energy's alter ego status was covered by the CBAs' dispute-resolution
provisions or subject to exhaustion. Second, the primary objective of seeking to impose alter ego
status on Duke Energy appears to be to make it subject to the terms of the CBAs as if it were a
signatory.

> are limited "to the meaning or interpretation of the terms of this Agreement, or as to the right of either party hereunder. . . ." Furthermore, "[t]he arbitrator shall have no authority to add to, modify or detract from the collective bargaining agreement . . . ."

(Doc. No. 33, at 13 (citing Doc. No. 30-4, 2018 CBA Art. XVI ("Sick Leave"); quoting 2018 CBA Art. XII ¶¶ 1, 4).)

This argument bears some parsing. Count III of the SAC is characterized as "Breach of Contractual Duty" under 29 U.S.C. § 185, and it is brought exclusively by the Union and not by the individual plaintiffs. (Doc. No. 26 ¶ 89.) The basis for this claim, as asserted in the SAC, is as follows: (1) the collective bargaining agreements described in the SAC are binding contracts between the employer and the Union, covered by 29 U.S.C. § 185; (2) the CBAs collectively conferred upon the individual plaintiffs and class members a contractual right to accrued sick leave and disability benefits; (3) Piedmont Gas breached those agreements by unilaterally terminating the named plaintiffs' and class members' Leave Banks and "otherwise refusing to honor [their] accrued benefits under these agreements"; and (4) the breach of the CBAs is actionable under § 185. (SAC ¶¶ 90–92.) In other words, the SAC itself clearly references, not only the 2018 CBA, but also all the predecessor CBAs that purportedly created the Leave Bank rights. However, despite this language in the SAC, the plaintiffs' futility argument in their Response to the Motion to Dismiss is based solely on the 2018 CBA. They assert that, because disputes subject to the grievance procedure in the 2018 CBA are limited to disputes related to the interpretation of that CBA or the rights of any party thereto, and no provision of the 2018 CBA actually incorporates reference to Leave Banks, "it would have been futile" for the Union or the individual plaintiffs to attempt to exhaust contractual remedies through the grievance procedures set forth in the 2018 CBA. (*Id.* ¶ 94.)

The problem with the plaintiffs' position is at least two-fold. First, 29 U.S.C. § 185(a),

the statute under which the Union brings Count III, provides, in relevant part, that "suits for violation of contracts between an employer and a [union] may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). In other words, the statute creates a federal venue for what would otherwise likely be a garden variety breach of contract action governed by state law. To bring such a claim, a plaintiff must actually allege breach of a collective bargaining agreement. *See Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW*, 523 U.S. 653, 656 (1998) ("By its terms, this provision [§ 185(a)] confers federal subject-matter jurisdiction only over "[s]uits for violation of contracts.").[7] Here, the Union argues that it is bringing suit for breach of the 2018 CBA while at the same time recognizing that the contractual provision it seeks to enforce is not actually contained in the subject contract. (*See* SAC ¶ 94 ("No provision in the 2018 CBA explicitly or implicitly references or incorporates accrued sick leave, sick bank, or leave bank benefits.").) On this basis, they claim that it would have been futile to attempt to seek relief through the grievance procedures in the 2018 CBA. (*See id.* ("Because the CBA does not contain any of these terms, it would have been futile for [the Union] to obtain relief through the grievance procedure or exhaust their administrative remedies.").)

    As a matter of logic, however, a party cannot bring suit for breach of contract while also admitting that there was no breach, and a defendant cannot be charged with breaching a

---

[7] In *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000 (6th Cir. 2009), the Sixth Circuit, without expressly acknowledging *Textron*, held based on *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006), that the failure to allege the existence of an operative collective bargaining agreement did not create a jurisdictional defect but, instead, affected the merits of the claim. As the Fifth Circuit later observed, however, *Winnett* "did not recognize that under *Textron*, section 301(a) jurisdiction requires an alleged labor contract violation." *Houston Ref., L.P. v. United Steel Mfg.*, 765 F.3d 396, 404 (5th Cir. 2014). Regardless, the court does not find here that it lacks jurisdiction over the plaintiffs' claims.

contractual obligation that is not, either "explicitly or implicitly" imposed by the subject contract. (*Id.*) The futility demonstrated here has nothing to do with the grievance procedure itself; rather, it is the futility of bringing a breach of contract claim to enforce an admittedly non-existent agreement. The Union cannot have it both ways. Either it is suing for breach of contract, in which case it is subject to the grievance procedures contained in the contract, or it is not, in which case it fails to state a claim under § 185(a) at all. In either event, to the extent Count III of the SAC is based on a purported breach of the 2018 CBA, it is subject to dismissal.

In addition, as suggested above, the plaintiffs' position actually appears to be that Piedmont Gas had no ability to repudiate what the individual plaintiffs contend to be vested leave rights created by the preceding CBAs.[8] As indicated above, Count III of the SAC references the CBAs in the plural, and it asserts that the Union "brings its separate cause of action . . . to remedy Defendants' breach of their collective bargaining agreements by unilaterally terminating sick leave and disability benefits and otherwise refusing to honor employees' accrued benefits." (SAC at 2.) The plaintiffs explain that, "[d]uring negotiations" leading to the formation of the 2018 CBA, Piedmont Gas and the Union

> did not bargain over sick leave and short-term disability benefits that were owed under prior collective bargaining agreements; instead, the Company unilaterally informed [the Union] that it would no longer honor accrued Leave Bank benefits in the new collective bargaining agreement, and unilaterally chose to deny accrued Leave Bank benefits to Named Participants and Class members.

(Doc. No. 26 ¶ 33.) Based on this language, the SAC may reasonably be construed as alleging that the 2012 CBA (or prior CBAs) created vested benefits that the employer was not entitled to modify or abolish in subsequent agreements, in which case the Union's claim would arguably be based upon breach of the prior CBAs rather than the 2018 CBA *per se*. The plaintiffs, however,

---

[8] The SAC repeatedly uses the term "accrued" rather than "vested," but the court construes the pleading as alleging that the individual plaintiffs and class members had vested benefits that could not be unilaterally terminated by Piedmont Gas.

have not attempted to argue that exhaustion of their claims under the prior CBAs would have been futile. Even if they had, the provisions they seek to enforce actually *are* included in the prior CBAs (*see, e.g.*, 2012 CBA Art. XVI ("Employees must use any accrued sick days in their Leave Bank (sick leave earned before January 1, 2005) when all of their annual sick days have been used . . . ."), and the question of whether the prior CBAs created vested, and therefore no-retractable, benefits appears to fall squarely within the scope of matters subject to the grievance procedures outlined in the contract: "any disagreement or dispute . . . as to the meaning or interpretation of the terms of this Agreement, or as to the rights of either party hereunder" (*id.* Art. XII ¶ 1). Thus, if Count III of the SAC is construed as asserting an actual breach of any of the earlier CBAs, the plaintiffs have failed to show futility with respect to these agreements as well.

### 3.     Conclusion: Count III Must Be Dismissed

Because the affirmative defense of failure to exhaust is clear from the face of the SAC and the plaintiffs have failed to allege facts that, if true, would establish that exhaustion would have been futile, the plaintiffs' claim in Count III under 29 U.S.C. § 185(a) is subject to dismissal.

### C.     **The ERISA Claim**

The defendants argue that the plaintiffs' ERISA claim is likewise subject to dismissal for failure to exhaust and, alternatively, that the sick leave program that is the subject of the plaintiffs' claims was a "payroll practice" rather than an ERISA-governed welfare plan. Finding the first argument to be meritorious, the court does not reach the second.

### 1.     Exhaustion

The defendants argue that the individual plaintiffs' ERISA claim, set forth in Count I of the SAC, is also subject to mandatory exhaustion under the contractual procedures set forth in

the operable CBA. They argue that the plaintiffs, besides failing to establish futility, cannot skirt the grievance procedures by characterizing their claims as "class claims," since the unavailability of classwide arbitration procedures is not a basis to invalidate an agreement to arbitrate.

In response, the plaintiffs do not contend that their ERISA claim is not subject to exhaustion. Instead, they argue that exhaustion would be futile, for the same reason that exhaustion of their LMRA claim would be futile. In addition, they maintain that the individual plaintiffs have made class allegations and that the CBA does not provide for arbitration of classwide disputes.[9] They posit that none of the individual class members has consented to classwide arbitration and that, even if the plaintiffs had "sought to arbitrate their grievance of their ERISA claims on a class-wide basis, the case law makes it all but certain they would have been barred from doing so." (Doc. No. 33, at 14.)

In the Sixth Circuit, "[i]n the context of a labor dispute, 'we begin with the presumption that national labor policy favors arbitration.'" *VanPamel v. TRW Vehicle Safety Sys., Inc.*, 723 F.3d 664, 667 (6th Cir. 2013) (quoting *United Steelworkers of Am. v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 277 (6th Cir. 2007)). This "presumption of arbitrability applies to disputes over retirees' benefits if the parties have contracted for such benefits in their collective bargaining agreement and if there is nothing in the agreement that specifically excludes the dispute from arbitration." *Id.* at 668 (quoting *Cleveland Elec. Illuminating Co. v. Util. Workers Union Local 270*, 440 F.3d 809, 816 (6th Cir. 2006)). In this case, the plaintiffs allege that the welfare benefits to which they claim entitlement were created by the CBAs between Piedmont Gas and the Union. As such, the claim is subject to contractual exhaustion and arbitration, unless some

_____

[9] In the SAC, the plaintiffs assert that exhaustion is excused because Piedmont Gas has "made it administratively impossible for the [individual plaintiffs] or other Class members to file for Plan benefits." (SAC ¶ 74.) The court construes this language as alleging futility.

exception to the exhaustion rule applies. In light of the plaintiffs' apparent concession of the issue and the absence of any indication in the CBAs of an intent to exclude benefits claims from arbitration, the court concludes that the ERISA claim falls within the scope of those claims that are subject to the grievance procedures set forth in the various CBAs.

2. <u>No Exception to Exhaustion and Arbitration Applies</u>

The plaintiffs' futility argument is foreclosed based on the same reasoning that applied to their LMRA claim. The plaintiffs also claim that exhaustion is excused because they bring class claims.

The plaintiffs are correct that, "[u]nless the parties have explicitly agreed to class-wide arbitration, it cannot be compelled," and "[m]ere silence on the issue does not constitute consent." (Doc. No. 33, at 14 (citing *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 687 (2010); *Reed Elsevier, Inc. v. Crockett*, 734 F.3d 594, 599 (6th Cir. 2013)).) However, the Supreme Court has also held that the unavailability of classwide arbitration procedures is not a basis for invalidating an agreement to arbitrate. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018) ("Our precedent clearly teaches that a contract defense 'conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures' is inconsistent with the Arbitration Act and its saving clause." (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2010))). The absence of an agreement to arbitrate classwide claims therefore does not mean that the plaintiffs can avoid arbitration by bringing class claims. *See McGrew v. VCG Holding Corp.*, 735 F. App'x 210, 211 (6th Cir. 2018) (dismissing class action and compelling individual arbitration based on *Epic*).

In short, bringing class claims is not a recognized exception to the exhaustion requirement. The plaintiffs' ERISA claim is subject to dismissal on this basis.

**D.      THRA Claim**

In Count II of the SAC, the individual plaintiffs assert a claim of age discrimination in violation of the THRA, Tenn. Code Ann. § 4-21-401(a)(1). Section 4-21-401(a)(1) makes it "a discriminatory practice for any employer to . . . discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's . . . age." In support of this claim, the plaintiffs allege that (1) they and the class members they represent are all over the age of 40 (SAC ¶ 80); (2) they earned and were entitled to the benefits provided to them pursuant to the "Plan" (*id.* ¶ 81), which is defined in the SAC as the "sick leave and short-term disability benefit plan" established by the "collective bargaining agreement in effect from 1989 to 1992" and continuing through successive CBAs (*see id.* ¶¶19–26, 34); (3) Piedmont Gas violated § 4-21-401 by "discriminatorily eliminating employee benefits"—*i.e.*, the accrued Leave Bank benefits—"as to only its oldest employees" and "did not reduce sick or disability benefits for younger employees" (SAC ¶ 82); (4) age was a primary motivating factor in Piedmont's decision, "because the only employees affected by the Company's adverse employment action were, upon information and belief, over the age of forty, and who had the most seniority with [t]he Company" and because the individual plaintiffs and class members, "as employees over the age of forty, are far more likely than younger employees to use sick and disability benefits for the treatment of their medical conditions" ( *id.* ¶¶ 83–84).[10]

The defendants assert that this claim must be dismissed as preempted by the LMRA, because it "arises solely out of the Union's and Piedmont Gas's collective bargaining efforts" and, as such, "is inextricably intertwined with the parties' CBA and their collective bargaining

---

[10] Although this claim is not characterized as being asserted in the alternative to their other claims, it appears to be factually incompatible with the other claims insofar as the support for it includes an allegation that Piedmont actually terminated the benefit in question. The other claims maintain that the Leave Bank benefit had actually vested and that Piedmont did not have the ability to terminate it.

efforts generally." (Doc. No. 30, at 22.) The plaintiffs respond that the THRA claim is not preempted, because resolution of this claim will not "require[e] the [c]ourt to interpret the sick bank provisions in the CBA." (Doc. No. 33, at 10.)

Section 301 of the Labor Management Relations Act authorizes district courts to hear "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). This section "governs claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987) (internal quotation marks and citation omitted). To this end, "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985) (internal citation omitted).

The Sixth Circuit has adopted a two-step analysis for determining whether Section 301 preemption applies:

> First, courts must determine whether resolving the state-law claim would require interpretation of the terms of the labor contract. If so, the claim is preempted. Second, courts must ascertain whether the rights claimed by the plaintiff were created by the labor contract, or instead by state law. If the rights were created by the labor contract, the claim is preempted. In short, if a state-law claim fails either of these two requirements, it is preempted by § 301.

*Paul v. Kaiser Found. Health Plan of Ohio*, 701 F.3d 514, 519 (6th Cir. 2012) (brackets and citations omitted).

Despite this relatively clear statement, the question of whether a state law claim is "substantially dependent" on analysis of a collective bargaining agreement is not always

straightforward. The Supreme Court has held that, "[e]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409–10 (1988) (footnote omitted). Generally, "[i]f the plaintiff can prove all of the elements of his claim without the necessity of contract interpretation, then his claim is independent of the labor agreement." *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994)

The Sixth Circuit has applied the two-prong test several times in the context of state-law discrimination claims—first in *Smolarek v. Chrysler Corp.*, 879 F.2d 1326 (6th Cir. 1989), a consolidated appeal involving two cases in which the plaintiff employees filed suit against the employers in state court for discrimination under a Michigan statute prohibiting disability discrimination and for workers' compensation retaliation. In reversing the district courts' determinations that the claims were preempted by the LMRA, the Sixth Circuit reviewed the Supreme Court's decisions in *Allis–Chalmers Corp.* and *Lingle*, among others. It recognized that the question of whether a state-law claim asserting a right that relates in some way to a provision of a CBA is preempted may turn on whether the state law claim is "inextricably intertwined with consideration of the terms of the labor contract" or whether, instead, the employment dispute only "tangentially involve[es]" a CBA provision. *Smolarek*, 879 F.2d at 1330 (quoting *Allis-Chalmers*, 471 U.S. at 213, 211). The court held that the fact that a CBA might provide the same relief as the state law was not sufficient to trigger preemption where the plaintiff sought relief solely under the state law. *Id.* at 1332–33. In addition, the fact that the employer raised terms of the CBA as a defense to a plaintiff's claim also did not establish that proof of the claims themselves was dependent on interpretation of the CBA. *Id.* at 1333.

In *Paul v. Kaiser Found. Health Plan of Ohio*, 701 F.3d 514, 520 (6th Cir. 2012), the court found that the "same considerations appl[ied] with equal force." There, the plaintiff asserted claims for disability discrimination and retaliation under state law. The defendant claimed preemption on the basis that the plaintiff's claims implicated rights under the collective bargaining agreement. The Sixth Circuit disagreed, noting that the plaintiff,

> as master of her claims, is entitled to assert her claims for relief exclusively under state law. However, if resolution of her claims is "substantially" dependent on analysis of terms of the CBA, then her claims are subject to complete preemption. The district court was thus required to look beyond the face of plaintiff's allegations and the labels used to describe her claims and had to evaluate the substance of plaintiff's claims.

*Id.* at 519 (internal citation omitted). In reviewing the substance of the plaintiff's claims, the court found it significant that the complaint "assert[ed] rights exclusively under Ohio's anti-discrimination civil rights law," did not mention the collective bargaining agreement, and did not invoke rights or procedures under the collective bargaining agreement. *Id.* at 520. While the defendant invoked the terms of the CBA in defending against the claim and justifying its own actions, the court held that the defendant's "reliance on the CBA as a defense is, in itself, insufficient to trigger preemption." *Id.* at 521. It was also relevant that the plaintiff sought damages and other forms of relief available under the state statute. She did not seek reinstatement, which the court recognized "might have implicated her rights under the CBA." *Id.* "This distinction underscores the fact that plaintiff is not asking the court to manage her CBA-governed relationship with her employer, but is asking for enforcement of rights under state anti-discrimination law independent of the CBA." *Id.*

The court in *Paul* also addressed the distinction between "tangentially related" and "inextricably intertwined":

> [P]reemption is required, even though resolution of a state law claim "will not involve the direct interpretation of a precise term of the CBA," if it will

nonetheless require the court "to address relationships that have been created through the collective bargaining process and to mediate a dispute founded upon rights created by a CBA."

*Id.* at 522 (quoting *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 218 (6th Cir. 1994)). In *Paul*, the defendant failed to show that that plaintiff's claim would require the court to address the relationship created by the CBA or to show that the CBA was more than tangentially related to the plaintiff's claims.

Conversely, in *Paluda v. ThyssenKrupp Budd Co.*, 303 F. App'x 305, 309 (6th Cir. 2008), the Sixth Circuit affirmed the district court's order denying a motion to remand to state court and granting a motion to dismiss on the basis of LMRA preemption. There, a group of plaintiffs brought suit asserting reverse age discrimination claims under state law, but their claim was based on their classification under a Plant Closing Agreement that was incorporated into and made part of an existing CBA. In conducting the two-step inquiry prescribed by Sixth Circuit precedent, the court acknowledged that the plaintiffs' right to be free from age discrimination did not arise under the CBA. *Id.* at 309. Nonetheless,

> [i]n contrast to typical claims of retaliatory or discriminatory discharge, . . . plaintiffs have alleged discrimination in the allocation of benefits under the Plant Closing Agreement. As defendants argue, plaintiffs' *prima facie* showing of age discrimination would require proof that plaintiffs were similarly situated to those employees who qualified for treatment as Group B employees under the Plant Closing Agreement and, in turn, whether they were eligible for Mutual Consent Early Retirement Benefits as defined by the Collective Bargaining Agreement, as modified by letter agreement.

*Id.* at 309 (internal citations omitted). Thus, because the plaintiffs' age discrimination claims were "substantially dependent on analysis of a collective bargaining agreement," it was completely preempted by the LMRA. *Id.*

More recently, in *Slinker v. Jim Beam Brands Co.*, 689 F. App'x 406 (6th Cir. 2017), the Sixth Circuit again held that the plaintiff's age discrimination claim was preempted because it

required interpretation of the parties' CBA. There, the plaintiff was terminated for failing a drug screen after an on-the-job accident. He filed suit claiming age discrimination in violation of Kentucky law. His complaint alleged that the employer had administered the drug tests in violation of the policies and procedures for such tests set forth in the CBA and, more specifically, that the drug testing policy had been inconsistently enforced. He alleged that a younger employee involved in a forklift accident had not been promptly drug tested. The district court granted summary judgment for the defendant on the age discrimination claim, finding that the employee's "allegation of disparate treatment under the drug testing policy would require interpreting the terms of the collective bargaining agreement, and thus Section 301 of the [LMRA] preempted the claim." *Id.* at 407.

The Sixth Circuit agreed that the plaintiff's complaint "plainly falls within the first prong" of the test as articulated above: that "resolving the state-law claim would require interpretation of the terms of the labor contract." *Id.* at 408 (quoting *Paul*, 701 F.3d at 519). The court continued:

> Slinker's complaint amply suggests interpretation of the union contract's drug-testing article is required to adjudicate his claim under Kentucky law—he complains that Jim Beam drug tested him in a manner that "violat[ed] . . . the policy and procedures outlined in the Collective Bargaining Agreement," while at the same time Jim Beam delayed a drug test for a younger co-worker also "in violation of the collective bargaining agreement. . . ." Determining whether Jim Beam complied with the union contract when it drug tested plaintiff and his co-worker necessarily requires interpreting the drug-testing provision of the contract. Because "plaintiff can[not] prove all of the elements of his claim without the necessity of contract interpretation"—*i.e.*, whether Jim Beam treated an alleged comparator differently—Section 301 preempts his claim . . . .

*Id.* at 408–09 (citations omitted).

In the case at bar, the defendants argue that the plaintiffs' age discrimination claim, like that in *Slinker*, "unavoidably requires interpretation of the parties' CBAs," as confirmed by the SAC itself, which alleges that the plaintiffs "earned and were entitled to the benefits provided

them pursuant to the Plan." (Doc. No. 30, at 24 (quoting SAC ¶ 81.) The defendants also argue that the plaintiffs' allegations that Piedmont Gas alone "controlled the terms of employment" for the individual plaintiffs and class members constitutes an attempt to minimize the Union's involvement in the process, given that it is the CBAs that address such issues as benefit plans, vacation, holidays, sick leave, and parental leave, "all of which are, broadly considered, employee benefits" that were negotiated as part of the collective bargaining process and agreed to by the Union. (*Id.*) The defendants also point out that the plaintiffs' claims arise, in their entirety, from the fact that the 2012 and previous CBAs reference carried-over sick leave but the 2018 CBA does not.

For their part, the plaintiffs contend that their claim does not require interpretation of the CBAs but requires, instead, an inquiry into Piedmont's conduct and motives in eliminating the Leave Banks. They argue that their claim is more closely analogous to that of the plaintiffs in *Lingle* and *Smolarek* than *Slinker* or *Paluda*.

A *prima facie* case of age discrimination under the THRA is identical to that under federal law. *See Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 620 (6th Cir. 2006); *Frye v. St. Thomas Health Servs.*, 227 S.W.3d 595, 610 (Tenn. Ct. App. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). A plaintiff may establish a *prima facie* case of age discrimination by showing that (1) he is forty years of age or older, (2) was qualified for his position, and (3) suffered an adverse employment action (4) "under circumstances giving rise to an inference of discrimination based on age." *Yount v. FedEx Express*, No. W2015-00389-COA-R3-CV, 2016 WL 1056958, at *5 (Tenn. Ct. App. Mar. 17, 2016) (citing *Wilson v. Rubin*, 104 S.W.3d 39, 52 (Tenn. Ct. App. 2002)). The fourth element "can be established by producing evidence that the plaintiff was replaced by a substantially younger employee or treated less favorably than a similarly situated, younger employee was treated." *Id.* (citing *Bundy v. First*

*Tenn. Bank Nat. Ass'n*, 266 S.W.3d 410, 417 (Tenn. Ct. App. 2007).

Primarily at issue here are the third and fourth prongs: whether the plaintiffs suffered an adverse employment action under circumstances giving rise to an inference of discrimination. The plaintiffs argue that the CBA is only tangentially related to this question, because the real issue is Piedmont's conduct and motives in eliminating the Leave Bank, which does not require interpretation of the CBAs. The defendants contend that the Leave Bank "was a feature of the parties' Sick Leave provision in the 2012 CBA" but eliminated from the 2018 CBA and replaced with a different sick leave benefit as a "product of collective bargaining." (Doc. No. 36, at 8.) They argue that the plaintiffs "cannot challenge Defendants' motive for a collectively bargained contractual term without implicating the underlying CBAs and the negotiating process leading up to them." (*Id.*)

The court finds that this case is more closely aligned with *Slinker* or *Paluda* than *Paul* or *Smolarek*. In *Paul*, the court found it significant that the plaintiff "assert[ed] rights exclusively" under state law, did not reference the collective bargaining agreement, and did not invoke her rights or procedures under such an agreement. *Paul*, 701 F.3d at 520. Here, in contrast, the plaintiffs assert rights under both the LMRA and state law; they reference the CBAs extensively, including in support of their THRA claim; and, again within the context of the THRA claim, they invoke rights created by the CBAs—the right to use accrued sick leave benefits (the Leave Bank) and the elimination of those rights in the 2018 CBA.

That is, although the plaintiffs' right to be free from discrimination on the basis of age is indisputably a right created by state (and federal) law independent of the CBA, the particular "right" claimed in the SAC was created solely by the CBAs: the right to accumulate and then bank and "carry over" sick leave hours accumulated prior to 2005. In that sense, their claim, like that in *Paluda*, is based on a classification created by the CBAs themselves. *See Paluda*, 303 F.

App'x at 309 (finding that the resolution of the plaintiffs' claim would require analysis of whether they were similarly situated to other employees who met the classification the plaintiffs sought and, therefore, was "substantially dependent on analysis of a collective bargaining agreement"). And in this case, too, to prove their claim, the plaintiffs would likely have to show that they were treated disparately from similarly situated employees outside the protected class. *See Yount*, 2016 WL 1056958, at *5. Doing so would require a close inspection of the leave rights created by the 2018 CBA.

Moreover, the proof the plaintiffs offer in support of discriminatory conduct is the employer's allegedly inequitable application of the leave policy created by the CBAs. To prove motive, which they claim to be critical, the plaintiffs will likely have to delve into the collective bargaining process itself—and the Union's involvement in that process and ultimate decision to accept a CBA that eliminated employees' right to use leave hours accrued prior to 2005. Thus, the CBAs and the collective bargaining process are not tangentially related to the plaintiffs' age discrimination claim. They are inextricably intertwined. Even if resolution of the claim might not "involve the direct interpretation of a precise term of the CBA," it will inescapably require the court "to address relationships that have been created through the collective bargaining process and *to mediate a dispute founded upon rights created by a CBA*," *Paul*, 701 F.3d at 522 (citation omitted) (emphasis added), specifically, the Leave Bank benefits and the decision made during the course of negotiations—as reflected in the final version of the 2018 CBA—not to continue recognizing those rights.

Because the plaintiffs' age discrimination claim is inextricably intertwined with the 2018 CBA and the collective bargaining process, including the negotiations leading to execution of the 2018 CBA, the THRA claim is preempted in its entirety by the LMRA, 29 U.S.C. § 185(a). As such, it is subject to dismissal.

**IV.      CONCLUSION**

For the reasons set forth herein, the defendants' Motion to Dismiss will be granted and this case dismissed. All claims against Duke Energy and the THRA claim against Piedmont Gas will be dismissed with prejudice. The LMRA and ERISA claims will be dismissed without prejudice to the plaintiffs' ability to attempt to redress them through the contractual process created by the operative CBAs.

An appropriate order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge